UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

WALTER MONZANO-MORENO, FERNANDO REYES

                              Plaintiffs,

          -against-

LIBQUAL FENCE CO., INC. d/b/a LIBERTY
FENCE & RAILING, ANTHONY STRIANESE,
DIMA CANALES, DIMA C. FENCE, INC. and
ESTUARDO JUAREZ,

                            Defendants.
-------------------------------------------------------------X

**Civil Action No.: 2:18-CV-00161(MKB)(AKT)**

### MEMORANDUM OF LAW IN SUPPORT OF THE LIBQUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Respectfully Submitted,**

**CAMPOLO MIDDLETON
& McCORMICK, LLP**
*Attorneys for Defendants*
4175 Veterans Memorial Hwy.
Suite 400
Ronkonkoma, NY 11779
(631)738-9100

TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS............................................................................................2

    A.  Libqual and Dima Fence are separate entities ...........................................2

    B.  Libqual hired Dima Fence as a subcontractor ...........................................2

    C.  Dima Fence Hired Plaintiffs.......................................................................3

    D.  Libqual did not control any aspect of Dima Fence's employment practices or policies 4

ARGUMENT ..........................................................................................................6

POINT I ...............................................................................................................6

THE LIBQUAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING THE COMPLAINT AGAINST them BECAUSE they ARE not PLAINTIFFS' EMPLOYERS WITHIN THE MEANING OF THE FLSA .........................................................................................6

    A.  The Libqual Defendants are not "employers" under the *Carter* formal control test ...8

        1.  *The Libqual Defendants had no power to hire and fire Plaintiffs* ...............8

        2.  *The Libqual Defendants did not supervise or control Plaintiffs' work schedules or conditions of employment* ................................................................9

        3.  *The Libqual Defendants did not determine the rate and method of payment of Dima Fence employees* ...................................................................10

        4.  *The Libqual Defendants did not maintain employment records for Plaintiffs* ..........11

    B.  The Libqual Defendants are not "employers" under the *Zheng* functional control test 12

        1.  *Plaintiffs did not use Libqual's premises and equipment* ...........................12

        2.  *Dima Fence was capable of shifting as a unit* .........................................13

        3.  *Plaintiffs' did not have discrete line-jobs* ..............................................14

        4.  *Responsibility passed under the contracts without material change* .........................15

        5.  *The Libqual Defendants did not supervise or control Plaintiffs' work schedules or conditions of employment* ..............................................................16

        6.  *It is irrelevant that Dima Fence predominately worked for Libqual* .........................16

    C.  The Libqual Defendants did not utilize Dima Fence as a subterfuge to avoid complying with labor laws ....................................................................17

POINT II.............................................................................................................18

PLAINTIFFS' SEVENTH CAUSE OF ACTION UNDER NEW YORK CITY ADMINISTRATIVE CODE § 20-929 MUST BE DISMISSED AS A MATTER OF LAW ...............................................18

CONCLUSION .....................................................................................................19

i

TABLE OF AUTHORITIES

Cases

*Abramson v. Pataki*,
  278 F.3d 93 (2d Cir. 2002) ...................................................................................6
*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................................6
*Barfield v. New York City Health and Hospitals Corp.*,
  537 F.3d 132 (2d Cir. 2008) ............................................................................7, 8
*Bartels v. Birmingham*,
  332 U.S. 126 (1947).............................................................................................7
*Carter v. Dutchess Community College*,
  735 F.2d 8 (2d Cir. 1984) ................................................................................7, 8
*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).............................................................................................6
*Chao v. Vidtape, Inc.*,
  196 F. Supp. 2d 281 (E.D.N.Y. 2002)...............................................................17
*Chen v. St. Beat Sportswear, Inc.*,
  364 F. Supp. 2d 269 (E.D.N.Y. 2005)...............................................13, 14, 17
*Frankel v. Bally, Inc.*,
  987 F.2d 86 (2d Cir. 1993) ..................................................................................7
*Godlewska v. HDA*,
  916 F. Supp. 2d 246 (E.D.N.Y. 2013)...............................................9, 11, 13, 17
*Herman v. RSR Security Servs. Ltd.*,
  172 F.3d 132 (2d Cir. 1999) ................................................................................7
*Jacobson v. Comcast Corp.*,
  740 F. Supp. 2d 683 (D. Md. 2010) ..................................................................18
*Jean-Louis v. Metro. Cable Commc'ns, Inc.*,
  838 F. Supp. 2d 111 (S.D.N.Y. 2011)........................................9, 10, 14, 15, 16, 18
*Lawrence v. Adderley Indus., Inc.*,
  No. CV-09-2309 SJF ETB, 2011 WL 666304 (E.D.N.Y. Feb. 11, 2011) ...............6, 10, 11, 18
*Lopez v. Silverman*,
  14 F. Supp. 2d 405 (S.D.N.Y. 1998)...................................................................7
*Martin v. Sprint United Mgmt. Co.*,
  273 F. Supp. 3d 404 (S.D.N.Y. 2017)............................................................9, 10
*Moreau v. Air France*,
  356 F.3d 942 (9th Cir. 2004) .............................................................................14
*Ovadia v. Office of Indus. Bd. of Appeals*,
  19 N.Y.3d 138 (2012)........................................................................................14
*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947).............................................................................................7
*Zheng v. Liberty Apparel Co., Inc.*,
  355 F.3d 61 (2d Cir. 2003) .....................................................8, 12, 13, 14, 15, 16

ii

Rules

Fed. R. Civ. Proc. 56(c)..............................................................................................6
Fed. R. Civ. Proc. 56(e)..............................................................................................6

Other Authorities

N.Y.C. Admin. Code § 20-927 ....................................................................................18
New York City Administrative Code § 20-929........................................................ 18

**PRELIMINARY STATEMENT**

Defendants Libqual Fence Co. ("Libqual"), Anthony Strianese ("Strianese"), and Estuardo Juarez ("Juarez") (collectively "Libqual Defendants") seek summary judgment dismissing the Second Amended Complaint of Plaintiffs Walter Monzano-Moreno ("Monzano") and Fernando Reyes ("Reyes") (collectively "Plaintiffs") because it cannot be disputed that the Libqual Defendants were not Plaintiffs' "employers." The evidence and testimony in this case overwhelmingly demonstrate that Dima C. Fence, Inc. ("Dima Fence")—a separate entity that performed subcontracting work for Libqual—employed Plaintiffs.

As discussed and analyzed in detail below, the evidence and testimony unequivocally demonstrate that the Libqual Defendants did not exert any control over Plaintiffs, let alone the formal or functional control required for the imposition of liability as an "employer." Libqual is a fence and railing manufacturer and installer that has clients across Long Island. As is common practice in the industry, Libqual utilized Dima Fence—a separately owned and operated entity—as an independent subcontractor to perform installations. To complete this work, Dima Fence used its own equipment and employees, and maintained its own wage and hour records. Libqual had absolutely no control, supervision, or authority over Dima Fence's employees. In all the aspects of employment, the economic realities of this case demonstrate that Plaintiffs' employers were Canales and Dima Fence, not the Libqual Defendants.

Unable to accept the economic realities of this case, Plaintiffs concocted a fiction in an attempt to extend liability to the Libqual Defendants. Plaintiffs allege that Dima Fence is a "sham" company the Libqual Defendants utilized as a subterfuge to avoid complying with labor laws. This theory has no basis in law or fact. It is based solely on Plaintiffs' misguided subjective beliefs, which are irrelevant.

In sum, the Libqual Defendants are entitled to summary judgment dismissing the Second Amended Complaint against them in its entirety because they never employed Plaintiffs in any capacity, and Plaintiffs were not "employees" of the Libqual Defendants.

STATEMENT OF FACTS

**A.      Libqual and Dima Fence are separate entities**

Libqual is a fence and railing manufacturer and installer that has been in business for over forty years. Affidavit of A. Strianese at ¶ 3 ("Strianese Aff."); Affidavit of Estuardo Juarez at ¶ 4 ("Juarez Aff."). Libqual has approximately forty-five employees. Strianese Aff. at ¶ 3; Juarez Aff. at ¶ 4. Approximately fifteen employees are involved with installation, and the remaining are involved with the manufacturing side of the business. Strianese Aff. at ¶ 3; Juarez Aff. at ¶ 4. Libqual installs fences all over Long Island. Juarez Aff. at ¶ 6.

Approximately twelve years ago, Canales organized Dima Fence because he "wanted to work on [his] own" (Ex. H at 18:25-19:2) to perform fence installment services. *See* Ex. H at 7:9-14. Dima Fence is a completely separate entity from Libqual. Strianese Aff. at ¶ 4; Juarez Aff. at ¶ 5; Ex. K. Dima Fence is separately owned, has its own employees, its own tax ID number, its own offices, and its own equipment. Strianese Aff. at ¶ 4; Juarez Aff. at ¶ 5; Ex. K.

**B.      Libqual hired Dima Fence as a subcontractor**

In the fencing industry, it is common practice for fencing companies to hire subcontractors to perform installations. *See* Ex. H at 119:14-20; Juarez Aff. at ¶ 6. In 2008, after Canales organized Dima Fence, he approached Juarez and asked if Libqual would use Dima Fence as a subcontractor. *See* Ex. H at 19-20:7. Beginning in 2008, Libqual utilized Dima Fence as an independent installation subcontractor. *See* Ex. F at 49:7-9. Dima Fence stopped performing subcontracting work for Libqual in 2017. Juarez Aff. at ¶ 6. After their relationship severed, Dima Fence began

2

performing work for other fencing contractors (Ex. H at 105:5-8) and transitioned to other work. Ex. F at 96:18-25.

While serving as a subcontractor to Libqual, Libqual provided contracts to Dima Fence for jobs it could service. Ex. H at 22:19-25, 23:2-5. Either Canales would call Libqual or someone from Libqual would call Canales to let him know if jobs were available for Dima Fence. *See* Ex. H at 23:6-24:17, 25:5-11; *see also* Ex. D at 18:3-11, 21:5-13, 24:9-17, 25:2-5. Canales would notify his Dima Fence employees/workers what work Libqual assigned Dima Fence. *See* Ex. H at 33:4-17.

After Dima Fence completed a contract, it received payment from the customer and Canales delivered the payment to Libqual. *See* Ex. H at 74:11-24; *see also* Ex. D at 19:5-7. Dima Fence submitted invoices on Dima Fence's letterhead to Libqual for work performed in connection with each customer. *See* Ex. H at 74-75; *see also* Ex. F at 89:20-25; Ex. G at 37:6-14; Ex. J. Libqual paid Dima Fence weekly based on the numbers of posts installed for each particular job and debris removal. *See* Ex. H at 70-72; *see also* Ex. J. Libqual made no payment to Dima Fence's employees, including Plaintiffs. *See* Ex. E at 20:8-10; *see also* Ex. D at 72:19-21; Strianese Aff. at ¶ 13.

### C.    Dima Fence Hired Plaintiffs

Canales hired Plaintiffs as seasonal installer helpers for Dima Fence. *See* Ex. H at 28:2-5; 34:4-7, 84:10-12, 88:15-17; *see also* Ex. D at 17:15-17, 22-23, 32:6-15; Ex. E at 20:12-14. Canales hired Monzano after meeting him through a personal friend who recommended Monzano work for Canales. *See* Ex. H at 81:17-82:14, 84:24-85:3; *see also* Ex. D at 15:19-16:2. Monzano worked at Dima Fence in 2016 and 2017. *See* Ex. H at 98:18-99:14. Dima Fence paid Monzano weekly at a daily rate of $130/day. *See* Ex. D at 29:16-19; *see also* Ex. H at 66:15-16. Dima Fence paid Monzano in cash because Monzano did not provide Canales with a social security number. *See*

Ex. H at 69:2-7, 87:2-10. Monzano received a 1099 and other tax forms from Dima Fence. *See* Ex. D at 67-68.

Reyes worked at Dima Fence from June 2016 through October 2016. *See* Ex. E at 111:12-15. Canales hired Reyes through Monzano who recommended him for work with Dima Fence. *See* Ex. H at 99:15-22; *see also* Ex. E at 16:9-18. According to Canales, Reyes was a W2 employee of Dima Fence. *See* Ex. H at 120:2-7. Dima Fence paid Reyes weekly at a daily rate of $120/day. *See* Ex. E at 19:2; *see also* at 66:10-12. Dima Fence paid Reyes by check with tax withholdings calculated by the company's accountant.  *See* Ex. H at 69:2-70:7.

Canales considered Plaintiffs to be employees of Dima Fence and explained to them that Dima Fence was a subcontractor for Libqual, and that they did not work for Libqual. *See* Ex. H at 83:5-20, 88:15-17, 101:5-11. Canales was the only person who decided Plaintiffs' rate of pay. (Ex. H at 88:12-14), and Plaintiffs only received payment from Dima Fence—never Libqual. *See* Ex. E at 20:8-10; *see also* Ex. D at 72:19-21. Furthermore, Canales directed Plaintiffs when to start work and to do certain tasks such as load and unload trucks. Ex. E at 29:6-25, 30:5-9.

### D.    Libqual did not control any aspect of Dima Fence's employment practices or policies

As a subcontractor and completely separate entity, Dima Fence was not controlled by Libqual at all. *See* Ex. F at 41:13-21, 49:10-15. Dima Fence hired its own employees, including Plaintiffs, without input from Libqual. *See* Ex. H at 84:2-8, 89:19-23; *see also* Ex. G at 25:16-18; Ex. F at 49:17-22, 53:11-24. Libqual did not control or manage hours of Dima Fence's employees, including Plaintiffs. *See* Ex. H at 93:23-25; *see also* Juarez Aff. at ¶ 8; Strianese Aff. at ¶ 6. Libqual did not set a daily start or end time for Dima Fence or its employees, including Plaintiffs. *See* Ex. H at 94:2-4; *see also* Juarez Aff. at ¶ 8; Strianese Aff. at ¶ 6. Libqual did not have authority to fire

Dima Fence's workers/employees, including Plaintiffs. *See* Ex. H at 103:5-7; *see also* Juarez Aff. at ¶ 8; Strianese Aff. at ¶ 6.

When Dima Fence began working as a subcontractor for Liberty Fence, Canales purchased machines, tools, and vehicles to perform the work. *See* Ex. H at 20:20-25, 21:2-8. Dima Fence owned two trucks that it used to perform subcontract work for Libqual. *See* Ex. D at 18:15-17; *see also* Ex. H at 20:20-25, 21:2-8, 63:3-4. Dima Fence's trucks were insured by and registered to Dima Fence. *See* Ex H at 41:3-7. Additionally, Dima Fence purchased other materials such as sand and cement from other companies (Ex. H at 39:18-25, 40:2-8; Ex. D at 25:10-15), as well as from Libqual at times. *See* Ex. F at 98:12-18. Although Libqual provided shirts to Dima Fence, Dima Fence workers were not required to wear them. In fact, Reyes never wore a Liberty Fence hat or shirt because he never got one. Ex. E at 50:23-25, 51:2-8.

Moreover, no one at Libqual was authorized to increase or decrease Plaintiffs' wages. *See* Ex. H at 88:9-11; *see also* Juarez Aff. at ¶¶ 11-12; Strianese Aff. at ¶¶ 6-7, 13. Dima Fence never discussed payment of wages with Libqual. *See* Ex. H at 76:2-5; *see also* Juarez Aff. at ¶¶ 11-12; Strianese Aff. at ¶¶ 6-7, 13. Libqual and Dima Fence also recorded and maintained separate wage and hour records. *See* Ex. H at 76:2-5; Juarez Aff. at ¶¶ 11-12; Strianese Aff. at ¶¶ 6-7, 13. All Libqual employees had to use a fingerprint punch clock that would automatically route the start and end times to Acu-Data, which is Libqual's payroll company. *See* Ex. F at 30:21-25, 31:2-6; Strianese Aff. at ¶ 12. On the contrary, Dima Fence kept track of time worked by writing down the days worked of each employee and paid its workers weekly. *See* Ex. H at 68:17-25, 121:13-17.

Furthermore, Libqual did not control how Dima Fence and its workers performed work, including Plaintiffs. *See* Ex. H at 93:23-25; Juarez Aff. at ¶¶ 8-9; Strianese Aff. at ¶¶ 6-7. Libqual

did not provide specific instructions to Dima Fence as to how complete jobs. *See* Ex. H at 104:2-3; Juarez Aff. at ¶¶ 8-9; Strianese Aff. at ¶¶ 6-7. Libqual did not supervise work performed by Dima Fence or its workers, including Plaintiffs. *See* Ex. H at 58:16-24, 102:18-24, 103:10-21; *see also* Ex. E at 25:15-20; Ex. D at 72:8-73:9. Libqual did not give time specifications on jobs subcontracted to Dima Fence. *See* Ex. G at 25:8-10.

ARGUMENT

POINT I

### THE LIBQUAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING THE COMPLAINT AGAINST THEM BECAUSE THEY ARE NOT PLAINTIFFS' EMPLOYERS WITHIN THE MEANING OF THE FLSA[1]

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial." Fed. R. Civ. Proc. 56(e).

---

[1] The arguments set forth under this point heading bar Plaintiffs first through sixth causes of action, all of which all various violations under the FLSA and NYLL. *Lawrence v. Adderley Indus., Inc.*, No. CV-09-2309 SJF ETB, 2011 WL 666304, at *11 (E.D.N.Y. Feb. 11, 2011) (dismissing plaintiff's FLSA and NYLL claims because defendant was not plaintiff's employer).

6

To be liable for the wage and hour violations under the FLSA and the NYLL alleged in the Complaint, the Libqual Defendants must be found to be Plaintiffs' "employer." *Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) ("To be liable under the FLSA, a person must be an 'employer.'"). In determining whether a defendant is an employer for purposes of the FLSA, "the overarching concern is whether the alleged employer possessed the power to control the workers in question . . . . with an eye to the 'economic reality' presented by the facts of each case." *Id.* Determining whether an employer-employee relationship exists as a matter of economic reality depends not on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730 (1947). However, "it is well-settled that the goal of the [economic realities] analysis is to determine whether the employees in question are *economically dependent* upon the putative employer." *Lopez v. Silverman*, 14 F. Supp. 2d 405, 414 (S.D.N.Y. 1998); *Frankel v. Bally, Inc.*, 987 F.2d 86, 89 (2d Cir. 1993) (describing the "economic realities" test as one that considers individuals to be employees "if 'as a matter of economic reality [they] are dependent upon the business to which they render service' ") (quoting *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)).

For purposes of this analysis, the Second Circuit has developed two tests for determining whether a joint employer relationship exists. The first of these tests is the "*Carter*" test, which examines the degree of "formal" control that a putative co-employer has over the workers in question. *See Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 142-43 (2d Cir. 2008) (citing *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984)). The focus of this test is on whether the alleged employer had formal control over the plaintiffs.

The other test, known as the *Zheng* test, seeks to determine whether an entity that lacks formal control over the workers nevertheless exercises functional control over them. *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 72 (2d Cir. 2003).

As discussed below, the Libqual Defendants do not come close to qualifying as Plaintiffs' "employers" under either the *Carter* test or the *Zheng* test.

**A.    The Libqual Defendants are not "employers" under the *Carter* formal control test**

The evidence unequivocally shows that the Libqual Defendants did not have formal control over Plaintiffs. A putative joint employer has formal control where it "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Barfield*, 537 F.3d at 142 (quoting *Carter*, 735 F.2d at 122). As discussed in more detail below, the Libqual Defendants cannot be considered Plaintiffs' "employers" under the *Carter* economic realities test because none of the aforementioned factors are satisfied here.

**1.    *The Libqual Defendants had no power to hire and fire Plaintiffs***

The undisputed evidence shows that the Libqual Defendants did not have the power to hire and fire Plaintiffs or other employees of Dima Fence. Canales hired Plaintiffs as seasonal helpers for Dima Fence. *See* Ex. H at 28:2-5, 34:4-7, 84:10-12, 88:15-17; *see also* Ex. D at 17:15-17, 22-23, 32:6-15; Ex. E at 20:12-12-14. Monzano received a 1099 and other tax forms from Dima Fence (Ex. D at 67-68), and Reyes was a W2 employee of Dima Fence. *See* Ex. H at 120:2-7. Canales, Strianese, and Juarez all testified that Dima Fence hired its own employees without input from Libqual. *See* Ex. H at 84:2-8, 89:19-23; *see also* Ex. G at 25:16-18; Ex. F at 49:17-22, 53:11-24. Likewise, each testified that Libqual did not have authority to fire Dima Fence's workers/employees. *See* Ex. H at 103:5-7.

8

Accordingly, the Libqual Defendants do not have power to hire and fire employees, and the first *Carter* factor is not satisfied. *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 424 (S.D.N.Y. 2017) (holding defendants were not employers where they did not have authority to hire and fire); *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 125 (S.D.N.Y. 2011) (same); *Godlewska v. HDA*, 916 F. Supp. 2d 246, 258 (E.D.N.Y. 2013) (same).

### 2.    *The Libqual Defendants did not supervise or control Plaintiffs' work schedules or conditions of employment*

The undisputed evidence also establishes that the Libqual Defendants did not supervise or control Plaintiffs' work schedules or conditions of employment. All of the scheduling of employees' work days and hours, including Plaintiffs, was handled by Canales and Dima Fence. Ex. E at 29:6-13. Additionally, Canales directed Plaintiffs to do certain tasks such as load and unload trucks. Ex. E at 29:21-25; 30:5-9.

To the contrary, Libqual had no supervision or control over Plaintiffs or other Dima Fence employees. Neither Monzano nor Reyes ever had conversations with the Libqual Defendants regarding terms of employment. *See* Ex. D at 73:2-6; Ex. E at 23:7-10. Libqual did not control or manage hours of Dima Fence's employees. *See* Ex.  Hat 93:23-25, 94:2-4. The Libqual Defendants did not control how Dima Fence and its workers performed work. *See* Ex. H at 93:23-25. The Libqual Defendants did not provide specific instructions to Dima Fence as to how complete jobs *See* Ex. H at 104:2-3. The Libqual Defendants did not give time specifications on jobs subcontracted to Dima Fence. *See* Ex. G at 25:8-10. Additionally, Libqual did not supervise work performed by Dima Fence or its workers, including Monzano and Reyes. *See* Ex. H at 102: 18-24, 103:10-21; *see also* Ex. E at 25:15-20; Ex. D at 72:8-73:9. Neither Juarez nor Strianese came to

9

job sites to supervise work being performed by Dima Fence or its employees/workers. *See* Ex. H at 58:16-24.

Moreover, the fact that certain Dima Fence workers wore Libqual shirts or that Dima Fence's trucks had Libqual signs on them does not imply an employment relationship existed with Libqual. *Lawrence v. Adderley Indus., Inc.*, No. CV-09-2309 SJF ETB, 2011 WL 666304, at *8 (E.D.N.Y. Feb. 11, 2011) ("[T]he requirement that Adderley's technicians wear uniforms and identification badges identifying themselves as being associated with Cablevision render them employees of Cablevision.").

Accordingly, the Libqual Defendants did not supervise or control Plaintiffs, and the second *Carter* factor is not satisfied. *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 427 (S.D.N.Y. 2017) (holding that even where defendants "may have had a degree of influence over field agents' work, it is not enough to show meaningful control . . . over plaintiffs' work schedules or conditions of employment."); *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 128 (S.D.N.Y. 2011) (holding defendant did not control or supervise plaintiffs where it submitted work orders identifying the services and did not provide any instruction as to how the services should be performed).

### 3. *The Libqual Defendants did not determine the rate and method of payment of Dima Fence employees*

The undisputed facts further establish that the Libqual Defendants had no involvement in determining the rate and method of Plaintiffs' compensation or that of the other employees at Dima Fence. During the relevant period, both Monzano and Reyes received payment only from Dima Fence—never Libqual. *See* Ex. E at 20:8-10; *see also* Ex. D at 72:19-21. Dima Fence paid Reyes weekly at a daily rate of $120/day and Monzano weekly at a daily rate of $130/day. *See* Ex. D at

29:16-19; *see also* Ex. H at 66:10-16; Ex. E at 19:2. Canales, on behalf of Dima Fence, was the

only person who decided Plaintiffs'' rates of pay. *See* Ex. H at 88:12-14.

No one at Libqual was authorized to increase or decrease Monzano's pay. *See* Ex. H at

88:9-11. Dima Fence never discussed payment of wages with Libqual. *See* Ex. H at 76:2-5.

Moreover, Neither Monzano nor Reyes ever had conversations with Libqual regarding wages or

pay. *See* Ex. D at 73:2-6; *see also* Ex. E at 18:22-19:5, 23:7-10.

Accordingly, the Libqual Defendants did not determine Plaintiffs' rate and method of

payment, and the third *Carter* factor is not satisfied. *Lawrence v. Adderley Indus., Inc.*, No. CV-

09-2309 SJF ETB, 2011 WL 666304, at *9 (E.D.N.Y. Feb. 11, 2011) (holding defendant did not

have control over plaintiffs' where defendant paid the contractors on a per service basis and the

contractors, in turn, paid their technicians on a per service basis).

### 4.  *The Libqual Defendants did not maintain employment records for Plaintiffs*

Finally, Dima Fence's time and wage records were separate from Libqual's. *See* Ex. H at

76:2-5. Dima Fence paid its workers weekly, and Canales kept track of time worked by writing

down the days worked of each employee. *See* Ex. H at 68:17-25, 121:13-17. During the relevant

period, Dima Fence had its own unemployment and worker's compensation insurance. *See* Ex. H

at 41:11-22.

Libqual utilized a completely different system to maintain its employees' records. All

Libqual employees had to use a fingerprint punch clock which would automatically route the start

and end times to Acu-Data, which is Libqual's payroll company. *See* Ex. F at 30:21-25, 31:2-6;

Juarez Aff. at ¶ 12; Strianese Aff. at ¶ 13.

Accordingly, the Libqual Defendants did not maintain employment records for Plaintiffs,

and the fourth *Carter* factor is not satisfied. *Godlewska,* 916 F.Supp.2d at 262 (holding defendant

11

did not satisfy this factor even where it maintained some employment records for quality control procedures).

**B.     The Libqual Defendants are not "employers" under the *Zheng* functional control test**

Because none of the four factors favor a finding that the Libqual Defendants had formal control over Plaintiffs, the Court's inquiry next turns to the factors bearing on whether the Libqual Defendants exercised functional control over plaintiffs.

Under the functional control test, the Court considers six factors: (1) whether Libqual's premises and equipment were used for the Plaintiffs' work; (2) whether Dima Fence had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which Plaintiffs performed a discrete line-job that was integral to Libqual's process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the Libqual Defendants supervised Plaintiffs' work; and (6) whether Plaintiffs worked exclusively or predominantly for the Libqual Defendants. *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 72 (2d Cir. 2003).

As discussed below, none of the six factors favor a finding that the Libqual Defendants had functional control over Plaintiffs.

### 1.     *Plaintiffs did not use Libqual's premises and equipment*

The first *Zheng* factor is whether Plaintiffs used Libqual's premises and equipment for their work. *Zheng*, 355 F.3d at 72. This factor "is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." *Id.*

Here, this factor is not satisfied because Plaintiffs performed all work off premises and did not use Libqual's equipment.  When Dima Fence began working as a subcontractor for Libqual,

Canales purchased his own machines and tools. *See* Ex. H at 20:20-25, 21:2-8, 63:3-4; *see also* Ex. D at 18:15-17; Ex. F at 49:17-22. Canales also had two trucks used to perform the work, which were insured by and registered to Dima Fence. *See* Ex. H at 41:3-7. Libqual had its own vehicles, and neither Dima Fence nor any of its employees/workers ever used Liberty's vehicles. *See* Ex. H at 49:9-25. Dima Fence purchased all other materials, such as sand and cement, from other companies. *See* Ex. H at 39:18-25, 40:2-8; *see also* Ex. D at 25:10-15. Other than briefly stopping at Libqual's warehouse in the morning to load fence materials for jobs, Dima Fence did not carry out any business activities at Libqual's premises and did not use any of Libqual's equipment. *See* Ex. H at 39:18-25, 40:2-8; *see also* Ex. D at 25:10-15.

Accordingly, Plaintiffs did not use the Libqual Defendants' premises or equipment, and the first *Zheng* factor is not satisfied. *Godlewska v. HDA*, 916 F. Supp. 2d 246, 262 (E.D.N.Y. 2013) (holding defendant was not employer where the plaintiffs worked off premises and did not use defendants' equipment); *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 281 (E.D.N.Y. 2005) ("Here, given the separate premises and equipment used, the Court finds that this factor weighs against a determination that defendants were joint employers of plaintiffs.")

## 2. *Dima Fence was capable of shifting as a unit*

The second *Zheng* factor is "whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another," *Zheng,* 355 F.3d at 72. The Second Circuit has described the second factor as "whether the [subcontractor] had a business that *could* or did shift as a unit from one putative joint employer to another," *Zheng,* 355 F.3d at 72.

Here, the undisputed evidence shows that Dima Fence had its own equipment, vehicles, and employees. Consequently, Dima Fence could, and, in fact, did shift work to itself and other contractors without issue after its relationships with Libqual ended. *See* Ex. H at 105:5-8.

Accordingly, Dima Fence could shift as a unit, and the second *Zheng* factor is not satisfied. *Jean-Louis*, 838 F. Supp. 2d at 132 (holding this factor not satisfied where subcontractor had "its own resources (a warehouse, tools, vehicles, and a cadre of employees) and can seek work from any other cable company at any time.")

### 3.   *Plaintiffs' did not have discrete line-jobs*

The third *Zheng* factor is the extent to which plaintiffs performed a discrete line job that was integral to Libqual's process of production. *Zheng,* 355 F.3d at 72. Courts have recognized this factor may have limited application in cases that involve services rather than production such as here. *Moreau v. Air France*, 356 F.3d 942, 952 (9th Cir. 2004) ("We question whether or not this factor translates well outside of the production line employment situation."); *accord Jean–Louis*, 838 F.Supp.2d at 134 ("[T]he third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product."). Courts caution that "[i]nterpreted broadly, this factor could be said to be implicated in *every* subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service."[2] *Zheng*, 355 F.3d at 73 (emphasis in original). However, the Second Circuit does not interpret this factor "quite so broadly." *Id.* To determine the weight of the third factor, the Court stated that "industry custom and historical practice should be consulted." *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 282 (E.D.N.Y. 2005).

Here, the third *Zheng* factor is not satisfied because the Plaintiffs are engaged in providing a service rather than a manufacturing product. *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F.

---

[2] In *Ovadia v. Office of Indus. Bd. of Appeals*, 19 N.Y.3d 138 (2012), the New York State Court of Appeals has also cautioned against broadly interpreting the *Zheng* factors in cases involving subcontractors. The Court of Appeals *Zheng* should not be unwieldly applied rendering "most general contractors the joint employers of their subcontractors' employees—a proposition that does not reflect the actual relationships in the construction industry." *Id.* at 143-44.

Supp. 2d 111, 134 (S.D.N.Y. 2011). In the fencing industry, it is typical for fencing companies to hire subcontractors to perform installations. . *See* Ex. H at 119:14-20; Strianese Aff. at ¶ 6. In industries where "the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws." *Zheng*, 355 F.3d at 73. Courts remain "mindful of the substantial and valuable place that . . . subcontracting relationships . . . have come to occupy in the American economy." *Id.* Not a modicum of evidence suggests Dima Fence is a subterfuge. As is common practice in the industry, Libqual subcontracted work to Dima Fence, who then hired its own employees, such as Plaintiffs, to perform the work.

Accordingly, industry custom and practices dictate that Plaintiffs did not perform discrete line job work, and the third *Zheng* factor is not satisfied. *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 134 (S.D.N.Y. 2011) (holding this factor was not satisfied where defendants demonstrated that similar companies in the industry operated by using contractors for particular service tasks).

### 4. *Responsibility passed under the contracts without material change*

The fourth *Zheng* factor is "whether responsibility under the contracts could pass from one subcontractor to another without material changes." *Zheng*, 355 F.3d at 72. This factor weighs in favor of a "determination of joint employment when employees are tied to an entity . . . rather than to an ostensible direct employer." *Id.* Conversely, where "employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employment relationship exists." Id. (quoting *Zheng*, 355 F.3d at 72). Thus, the fourth factor asks whether if the putative joint employer hired one contractor rather than another, "the *same* employees would continue to do the *same* work in the *same* place." *Id.* at 74 (emphasis in original).

This factor is not satisfied here because Dima Fence employees were fungible and owed no allegiance to Libqual. Dima Fence stopped performing subcontracting work for Libqual in 2017, at which time Dima Fence then began performing work for other fencing contractors. (Canales at 105:5-8). After Dima Fence stopped performing work for Libqual, Libqual used other subcontractors. *See* Ex. F at 96:18-25. No other Dima Fence employees, including Plaintiffs, continued installing fences for Libqual after their relationship severed. Dima Fence was merely a fungible contractor whose employees performed work for Libqual "only to the extent that their direct employer [Dima Fence] is hired by that entity." *Zheng*, 355 F.3d at 72.

Accordingly, responsibility could pass under the contracts without material changes because Dima Fence and Plaintiffs were fungible, and the fourth *Zheng* factor is not satisfied. *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 135 (S.D.N.Y. 2011) (holding this factor was not satisfied because there was not evidence that technicians would continue providing services if putative joint-employer severed its relationship with contractor).

### 5.  *The Libqual Defendants did not supervise or control Plaintiffs' work schedules or conditions of employment*

The fifth *Zheng* factor is "the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work," *Zheng*, 355 F.3d at 72. As set forth above with respect to the second *Carter* factor, there is no evidence the Libqual Defendants supervised or controlled Plaintiffs' work schedule or terms of employment. *See infra* Part.1.A.2.  Accordingly, the fifth *Zheng* factor is not satisfied. *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 135 (S.D.N.Y. 2011).

### 6.  *It is irrelevant that Dima Fence predominately worked for Libqual*

The sixth *Zheng* factor is "whether plaintiffs worked exclusively or predominantly for [the putative joint employer]." *Zheng*, 355 F.3d at 72. Courts have held that even where, as here, a

16

subcontractor does perform all of its work a putative joint-employer, it is not sufficient where the balance of the factors demonstrated the putative joint-employer did not exercise functional control over plaintiffs. *Godlewska v. HDA*, 916 F. Supp. 2d 246, 265 (E.D.N.Y. 2013) (holding that even where plaintiffs predominately worked for putative joint employer, "on balance, [the factors demonstrated defendants] did not exercise functional control over plaintiffs."); s*ee also Zheng,* 355 F.3d at 76-77 ("[T]he Court need not decide that *every* factor weighs against joint employment.") (emphasis in original).

### C.     The Libqual Defendants did not utilize Dima Fence as a subterfuge to avoid complying with labor laws

Unable to dispute the economic realities of this case, Plaintiffs will resort to fantasy in an attempt to save their failed claims against the Libqual Defendants—parties that never employed them. The only argument Plaintiffs raise to oppose this reality is that they thought they were employed by the Libqual Defendants because Dima Fence was a "sham" entity. This argument is pure fiction based on Plaintiffs' subjective beliefs and testimony, not any facts or legal authority. *See* Ex. D at 12-15; *see also* Ex. E at 12:8.

Plaintiffs' subjective beliefs attempting to dispute the unequivocal economic reality of this case are irrelevant. *Chen*, 2016 WL 5678543, at *3 ("[Employee]'s subjective beliefs, no matter how genuinely held, are simply of no consequence in assessing . . . status as an employer under the economic reality test."); *Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281, 291 (E.D.N.Y. 2002) (holding plaintiffs' testimony that an individual was their boss was not sufficient to support a finding that he was an employer under the economics reality test).

As demonstrated above, the economic reality in this case shows that the Libqual Defendants were not the employers of Plaintiffs. To infer joint employment from the economic

realities of this case would "subsume typical independent contractor relationships," which this court has cautioned against time and time again. *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 689 (D. Md. 2010); *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011); *Lawrence v. Adderley Indus., Inc.*, No. CV-09-2309 SJF ETB, 2011 WL 666304, at *9 (E.D.N.Y. Feb. 11, 2011).

## POINT II

### PLAINTIFFS' SEVENTH CAUSE OF ACTION UNDER NEW YORK CITY ADMINISTRATIVE CODE § 20-929 MUST BE DISMISSED AS A MATTER OF LAW

Plaintiffs' last futile effort for recovery resorts to a misplaced reliance on NYC Administrative Code § 20-929, also known as the New York City Freelance Isn't Free Act ("FIFA"). According to the plain text of the statute, FIFA does not apply to this case.

FIFA does not apply because as a New York City administrative rule, it only applies to contracts in New York City. The work at issue in this case involved work on Long Island. Thus, FIFA does not apply to this case because New York City contracts are not at issue here. N.Y.C. Admin. § 20-928.

To the extent minimal work was performed in New York City, FIFA still does not apply here because it only covers "freelance workers." As defined under N.Y.C. Admin. Code § 20-927, "freelance workers" means "any natural person or any organization composed of no more than one natural person." Here, both entities at issue are corporate entities consisting "more than one natural person." Clearly, FIFA is intended to protect individual freelancers, not situations like here where one corporate entity subcontracts work to another.

Thus, Plaintiffs' seventh cause of action under FIFA must be dismissed because it is facially inapplicable.

## CONCLUSION

The Libqual Defendants are entitled to summary judgment because the evidence and testimony demonstrates they did not exert the type of formal or functional control over Plaintiffs required for the imposition of liability as an "employer." Accordingly, the complaint must be dismissed against the Libqual Defendants in all respects with prejudice.

Dated: Ronkonkoma, New York
       February 28, 2020

**CAMPOLO, MIDDLETON**
**& McCORMICK, LLP**

_____
By:    Jeffrey V. Basso, Esq.
        Richard A. DeMaio, Esq.
*Attorneys for Defendants Libqual Fence Co.*
*Inc. Anthony Strianese, and Estuardo Juarez*
4175 Veterans Memorial Highway
Suite 400
Ronkonkoma, New York 11779
(631) 738-9100