**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
WALTER MONZANO-MORENO and
FERNANDO REYES,

Plaintiffs,

-against-

LIBQUAL FENCE CO., INC. (d/b/a LIBERTY
FENCE & RAILING), ANTHONY STRIANESE,
DIMA CANALES, DIMA C. FENCE, INC., and
ESTUARDO JUAREZ,

Defendants.
-------------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

CV 18-0161 (MKB) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    PRELIMINARY STATEMENT

Plaintiffs Walter Monzano-Moreno ("Monzano") and Fernando Reyes ("Reyes")

(collectively, "Plaintiffs") commenced this action against corporate Defendants Libqual Fence

Co., Inc. d/b/a Liberty Fence & Railing ("Libqual Fence") and Dima C. Fence, Inc. d/b/a Dima

Fence ("Dima Fence") and individual Defendants Anthony Strianese ("Strianese"), Estuardo

Juarez ("Juarez"), and Dima Canales ("Canales")[1] for violations of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. §§ 201 *et seq.*, New York Labor Law ("NYLL"), and the New York City

Administrative Code ("NYCAC") § 20-929.  *See generally* Second Amended Complaint

("SAC") [DE 49].  Plaintiffs seek to recover damages for Defendants' alleged failure to pay

overtime and minimum wages as well as other violations of applicable law.  *Id.*

---

[1]      On February 8, 2020, Judge Brodie "so ordered" a Stipulation of Partial
Discontinuance executed by the parties dismissing this action, with prejudice, as to Defendants
Dima Canales and Dima C. Fence, Inc. only.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."),

Defendants Libqual Fence, Strianese, and Juarez (collectively, "Defendants") now move for

summary judgment, dismissing the Second Amended Complaint as against all of the Defendants,

with prejudice.   *See generally* Defendants' Memorandum of Law in Support of Motion for

Summary Judgment ("Defs.' Mem.") [DE 69]; Defendants' Reply Memorandum of Law in

Further Support of Motion for Summary Judgment ("Defs.' Reply") [DE 66-2].  Plaintiffs

oppose the motion, arguing primarily that the facts here show "the existence of joint

employment" between Dima Fence and Libqual Fence "under a proper application of [the]

economic realities test."  Plaintiffs' Memorandum of Law in Opposition to Motion for Summary

Judgment ("Pls.' Opp'n") [DE 67] at 1.

 Judge Brodie referred Defendants' motion for summary judgment to this Court for a

Report and Recommendation as to whether the motion should be granted.  *See* May 15, 2020

Electronic Order.  For the reasons which follow, the Court respectfully recommends to Judge

Brodie that Defendants' motion for summary judgment be GRANTED.

## II.    BACKGROUND

### A.    Preliminary Issues

In accordance with Rule 56.1 of the Local Rules of the United States District Courts for

the Southern and Eastern Districts of New York, the Defendants submitted (1) a Statement of

Undisputed Material Facts ("Defs.' SOMF") [DE 65-15]; (2) the Declaration of Jeffrey V. Basso,

Esq. ("Basso Decl."), counsel for the Defendants  [DE 65-1]; (3)  the Affidavit of Anthony

Strianese, President of Libqual Fence ("Strianese Aff.") [DE 65-13]; and (4) the Affidavit of

Estuardo Juarez, Vice-President of Libqual Fence ("Juarez Aff.") [DE 65-14] in support of their

motion.  In opposing Defendants' motion, the Plaintiffs have submitted a "response" to

2

Defendants' Rule 56.1 statement ("Pls.' 56.1(b) Resp.") and Counterstatement of Material Facts

("Pls.' COMF") [DE 13-7] [2] as well as Plaintiffs' Memorandum in Opposition [DE 67].

Both parties conform to the local rule which requires that "[e]ach statement …, including

each statement controverting any statement of material fact, must be followed by citation to

evidence which would be admissible." Rule 56.1(d). However, both the Defendants' Rule

56.1(a) Statement and Plaintiffs' Rule 56.1(b) responses improperly mix factual assertions with

legal arguments and conclusions. *See LG Capital Funding, LLC v. PositiveID Corp.,* No. 17-

CV-1297, 2019 WL 3437973, at *2 (E.D.N.Y. July 29, 2019), *report and recommendation*

*adopted*, No. 17-CV-1297, 2019 WL 4564882 (E.D.N.Y. Sept. 20, 2019) ("Legal arguments are

impermissible in any Rule 56.1 Statement and are to be disregarded."). For example, Plaintiffs'

Rule 56.1(b) response, which presents significantly more instances of such conduct, includes

several denials on the basis that "Dima Fence during the relevant time period was a sham entity

and it is impossible for anyone to legal[ly] work for a sham entity" or "Dima Fence during the

relevant time period was a sham entity and was at most a subdivision of Libqual." Pls.' 56.1(b)

Resp. ¶¶ 28-31, 35-39, 41-50, 53, 56, 57-73, 76-78, 81-82. These responses and the citations to

the record in support of these responses, however, do not "specifically controvert" the factual

assertions made in Defendants' Rule 56.1(a) Statement. *See Stewart v. Fashion Inst. of Tech.,*

No. 18-CV-12297, 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("Pursuant to Local Civil

Rule 56.1, the movant's 'statements are deemed to be admitted where [the non-moving party]

has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. New*

---

[2]     Plaintiffs combined their Rule 56.1(b) response and Counterstatement of Material
Facts into one document found at DE 66-1. Plaintiffs began their Counterstatement of Material
Facts after their Rule 56.1(b) responses, starting the numbered paragraphs again at 1. The Court
hereafter refers to the first section of DE 66-1 as "Pls.' 56.1(b) Resp." and the second section of
DE 66-1 as "Pls.' COMF."

*York City Hous. Auth.*, No. 03-CV-2746, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007));

*Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881, 2012 WL 4498827, at *2 n.2 (E.D.N.Y.

Sept. 12, 2012) ("Local Rule 56.1 requires ... that disputed facts be *specifically* controverted by

admissible evidence.  Mere denial of an opposing party's statement or denial by general reference

to an exhibit or affidavit does not specifically controvert anything.") (emphasis in original).  To

the extent Plaintiffs' 56.1(b) response "improperly interjects arguments and/or immaterial facts

in response to facts asserted by [Defendants] without specifically controverting those facts," the

Court has disregarded the response.  *See McFarlane v. Harry's Nurses Registry*, No. 17-CV-

6350, 2020 WL 1643781, at *1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp.

2d 75, 85 n.2 (S.D.N.Y. 2012)).

Moreover, the Court points out that Rule 56.1 requires the nonmovant to "include a

correspondingly numbered paragraph responding to each numbered paragraph in the statement of

the moving party, and *if necessary*, additional paragraphs containing a separate, short and

concise *statement of additional material facts* as to which it is contended that there *exists a

genuine issue to be tried*."  Rule 56.1(b) (emphasis added).  Plaintiffs' Rule 56.1

Counterstatement of Material Facts does not assert any facts for which there appears to exist

genuine issues to be tried nor does it serve to dispute the material facts asserted by Defendants.

Rather, it asserts additional facts, some of which are material to the issues raised in the instant

motion.  *See I.M. v. United States,* 362 F. Supp. 3d 161, 190 (S.D.N.Y. 2019) ("On a motion for

summary judgment, a fact is material if it might affect the outcome of the suit under the

governing law.").  Because Defendants failed to respond to these additional material facts, an

argument can be made that these facts should be deemed admitted by Defendants.  *See* Rule

56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement

required to be served by the moving party will be deemed to be admitted for purposes of the

motion unless specifically controverted by a correspondingly numbered paragraph in the

statement required to be served by the opposing party."); *Genova v. Cty. of Nassau*, No. 17-CV-

4959, 2019 WL 8407451, at *1 (E.D.N.Y. Dec. 26, 2019), *report and recommendation*

*adopted*, No. 17-CV-4959, 2020 WL 813160 (E.D.N.Y. Feb. 19, 2020) ("Because Plaintiff has

failed to comply with Rule 56.1, the relevant facts, as set forth below, are deemed admitted by

Plaintiff, and are therefore taken solely from Defendants' Rule 56.1 Statement.").

However, "[a] district court has broad discretion to determine whether to overlook a

party's failure to comply with local court rules." *Holtz v. Rockefeller & Co*., 258 F.3d 62, 73

(2d. Cir. 2001). "Rather than rely on the parties' respective Local Rule 56.1 statements, a

court 'may in its discretion opt to conduct an assiduous review of the record.'" *Chen v.*

*Shanghai Cafe Deluxe, Inc.*, No. 17-CV-2536, 2019 WL 1447082, at *7 (S.D.N.Y. Mar. 8, 2019)

(quoting *Holtz*., 258 F. 3d at 73)*; see also Pensionsversicherungsanstalt v. Greenblatt*, 556 Fed.

App'x 23, 25 (2d Cir. 2014) (Summary Order) (noting that "nothing requires a district court to

deem evidence admitted, or grant summary judgment, simply because a non-movant fails to

comply with local rules such as Local Rule 56.1").

Here, the Court has conducted an independent review of the record, including the

Defendants' Rule 56.1(a) statement, Plaintiffs' Rule 56.1(b) responses, Plaintiffs'

Counterstatement of Additional Material Facts, and affidavits submitted in connection with the

motion, along with the exhibits attached to those affidavits. From these, the Court sets forth

what it considers to be the undisputed facts or facts uncontroverted by admissible evidence. *See*

*Truitt v. Salisbury Bank & Tr. Co*., No. 18-CV-8386, 2020 WL 4208452, at *1 (S.D.N.Y. July

21, 2020). In doing so, the Court construes the facts in the light most favorable to the party

opposing the respective motion.  *See Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008);

*Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001); *Coastal Pipeline Prod. of New York v.*

*Gonzales*, No. 04-CV-8252, 2006 WL 473883, at *4 (S.D.N.Y. Feb. 28, 2006).

### B.     The Undisputed Material Facts

#### 1.     *Libqual Fence*

Libqual Fence is a fence and railing manufacturer and installer.  Defs.' SOMF ¶ 1.

Libqual Fence maintains an office at 775 Meacham Avenue, Elmont, New York.  *Id*. ¶ 4.

Strianese is the owner and President of Libqual Fence.  *Id*. ¶ 2.  Juarez is the Vice-President of

Libqual Fence and oversees and manages Libqual Fence's staff.  *Id*. ¶ 3.  He is responsible for

hiring, setting wages and scheduling.  *Id*.  Libqual Fence employs approximately 45 individuals,

15 of whom are involved with fence installation while the remaining 30 deal with manufacturing.

Juarez Aff. ¶ 4.  Libqual Fence's employees, with the exception of Strianese and Juarez, are paid

hourly and are required to clock-in and clock-out through a fingerprint time system.  *Id*. ¶ 12; *see*

Transcript of August 5, 2019 Deposition of Anthony Strianese ("Strianese Tr."), annexed to the

Basso Decl. as Ex. F at 31:11-19, 41:13-42:4.  Libqual Fence pays its employees through a third-

party payroll processing company, Acu-Data, which provides the employees with pay stubs

documenting their wages.  Juarez Aff. ¶ 12; Defs.' SOMF ¶ 67.  When Libqual Fence hires a

subcontractor to perform fence installation work, it pays the subcontractor "a set price based

upon the amount of fence installed (per post) and debris removed."  Juarez Aff. ¶ 6; Strianese Tr.

99:23-100:8.

At some point in time between 2014 and 2017, Canales was directly employed by

Libqual Fence as a fence installer.  Transcript of August 5, 2019 Deposition of Estuardo Juarez

("Juarez Tr."), annexed to the Basso Decl. as Ex. G at 17:4-10; Strianese Tr. 45:24-46:7, 98:25-

99:17.  During this time, Canales was Libqual Fence's W-2 employee and was paid hourly.

Juarez Tr. 18:2-23; Strianese Tr. 48:4-10, 99:10-100:8.  For exactly how long Canales directly

worked as Libqual Fence's employee is unclear from the record; however, it was no less than a

"few weeks" and no longer than a year.  Juarez Tr. 18:2-9; Strianese Tr. 45:24-47:13.  According

to Juarez and Strianese, Canales was briefly employed by Libqual Fence due to certain

"insurance issues" Dima Fence had.  Juarez Tr. 17:4-10 Strianese Tr. 45:24-46:7, 98:25-99:17.

### 2.      *Dima Fence*

Dima Fence, an entity organized under the laws of the State of New York, is a fence

installer.  Defs.' SOMF ¶ 7; Transcript of August 6, 2019 Deposition of Dima Canales ("Canales

Tr."), annexed to the Basso Decl. as Ex. H at 7:9-11; "New York State Department of State

Division of Corporations Entity Information," annexed to Basso Decl. as Ex. K.  Canales is the

owner of Dima Fence.  Defs.' SOMF ¶ 6.  Dima Fence maintains an office at 711 Stanton

Avenue, Baldwin, New York.  Canales Tr. 7:18-24.  Since its formation in 2008, Dima Fence has

maintained its own telephone number, website,[3] and unemployment and worker's compensation

insurance.[4]  Defs.' SOMF ¶¶ 8-9, 81.  Between 2014 and 2017 -- the time frame during which

Plaintiffs were employed by Dima Fence -- Dima Fence exclusively performed fence installation

work for Libqual Fence.  Canales Tr. 22:12-15; Pls.' COMF ¶¶ 27-30.  After 2017, Dima Fence

stopped performing installation work for Libqual Fence and began performing installation work

for other fencing companies.  Defs.' SOMF ¶ 26.  Between 2014 and 2017, Dima Fence did not

---

[3]      Dima Fence's website has been active since 2018.  Canales Tr. 117:18-19.

[4]      At some point between 2014 and 2017, Dima Fence's worker's compensation
insurance lapsed for approximately eight months, although the record is unclear as to exactly
when that occurred.  Canales Tr. 41:23-42; Strianese Tr. 47:10-13.

possess a consumer affairs license to perform home improvements, including fence installations, in Nassau and Suffolk Counties or New York City.  Pls.' COMF ¶¶ 1-12.

Dima Fence used its own machines, tools and trucks when it performed installation work for Libqual Fence.  Defs.' SOMF ¶¶ 77-78.  The company owned two trucks, both of which were insured by and registered to Dima Fence.  *Id.* ¶ 79.  Dima Fence would park both of its trucks at Libqual Fence's office at the conclusion of the workday.  Pls.' COMF ¶ 36.  Until 2017, Dima Fence's trucks displayed a permanent Libqual Fence company sign on them.  Pls.' COMF ¶¶ 31-35, 36.  Thereafter, Dima Fence changed the signs to a permanent Dima Fence company sign.  *Id.* ¶ 35; Canales Tr. 114:25-116:4.  However, it would place a magnetic Libqual Fence company sign over its own Dima Fence sign whenever it was performing installation work for Libqual Fence.  *Id.*; Canales Tr. 114:25-116:4.  Dima Fence's employees used only Dima Fence's trucks and never used Libqual Fence's trucks.  Defs.' SOMF ¶ 80; Strianese Tr. 65:18-66:6; Juarez Tr. 24:7-10.

Libqual Fence and Dima Fence did not enter into any written contracts for the fence installation work performed by Dima Fence for Libqual Fence but rather communicated orally regarding the installation work.  Defs.' SOMF ¶ 17; Strianese Tr. 50:2-10.  Defendant Canales called Libqual Fence to identify what, if any, work was available for the following day, or vice versa.  Defs.' SOMF ¶ 17.  Thereafter, Canales would notify Dima Fence's employees what work they had for the following day.[5]  *Id.* ¶ 18.  Dima Fence performed installation work for

---

[5]      Plaintiffs cite the deposition testimony of Plaintiff Walter Monzano to deny this fact on the basis that "Plaintiffs (employees of Moving Defendants) worked six days a week from March to December."  Pls.' 56.1(b) Resp. ¶ 18.  The portion of the record cited by Plaintiffs in support of this response merely speaks to Monzano's work schedule and does not "specifically controvert" the statement of fact asserted by the Defendants.

Libqual Fence five to six days per week during the "busy" season and two to three days per week, or not at all, during the "slow" season.[6]  *Id*. ¶¶ 20-21.  Dima Fence's employees, including Canales, generally began their workday between 7 and 8 a.m. and ended the workday between 4 and 9 p.m.  Pls.' COMF ¶¶ 37-41; Canales Tr. 28:15-29-11, 73:8-13.  At the beginning of the workday, Dima Fence's employees, including Plaintiffs, would meet at Libqual Fence's office, load Dima Fence's truck with materials, and drive in that truck to the residential job site at which they were installing a fence.  Canales Tr. 28:15-34:25, 48:25-49:25, 54:20-55:4.  At the end of the workday, Dima Fence's employees would return to Libqual Fence's office to unload and park Dima Fence's truck and pick up their own vehicles which were parked on the same street as Libqual Fence's office.  *Id*.

When beginning a new installation job for Libqual Fence, Canales would obtain written information regarding the job from Libqual Fence's secretary, including, but not limited to, a worksheet with a diagram of the installation, notes regarding any preferences Libqual Fence's client may have, the fencing required for the installation, and, occasionally, a survey of the property at which the installation was being done.  Strianese Tr. 71:22-72:15; Canales Tr. 35:11-36:6, 36:12-37:12.  The worksheet contained a "100 percent satisfaction guarantee certificate" for Libqual Fence's client to sign after the installation was completed.  Strianese Tr. 72:23-73:15.  The fence installer assigned to the job was required to obtain the customer's signature on the customer satisfaction certificate.  *Id*.; Juarez Tr. 34:2-9.  Libqual Fence provided Dima Fence with fence posts for each installation job.  Defs.' SOMF ¶ 82; Canales Tr. 37:20-38:13.

---

[6]     There is a dispute as to the exact months the "busy" and "slow" seasons spanned.  Defs.' SOMF ¶ 19; Pls.' 56.1(b) Resp. ¶ 19.  However, the precise time and length of these seasons is not material.

However, Dima Fence was responsible for obtaining and purchasing other required materials, such as cement and sand.  Canales Tr. 37:20-38:13.

After completing an installation job for Libqual Fence, Dima Fence was required to collect from the client the balance owed to Libqual Fence, along with the executed customer satisfaction certificate.  Canales Tr. 74:11-24; Juarez Tr. 34:2-9.  Thereafter, Dima Fence would submit an invoice on its own letterhead to Libqual Fence for the work it performed in connection with the installation job.  Defs.' SOMF ¶ 23.  Libqual Fence paid Dima Fence weekly based on the number of posts installed and debris removed for each installation job.  *Id*. ¶¶ 24-25.

Canales testified that Libqual Fence was not involved in the hiring of any of Dima Fence's employees, Canales Tr. 84:2-8, 89:19-23, and did not have the authority to fire Dima Fence's employees, Defs.' SOMF ¶ 62.  Canales also testified that Libqual Fence did not set the hours Dima Fence's employees worked.  Defs.' SOMF ¶ 60.  Dima Fence never discussed its employees' wages with Libqual Fence.  *Id*. ¶ 63.  According to Canales, Libqual Fence did not have authority to alter the compensation of Dima Fence's employees.  *Id*. ¶¶ 39, 64.  Dima Fence paid its employees weekly, and Canales kept track of the time worked by writing down the days, not hours, each employee worked.  *Id*. ¶ 65; Canales Tr. 68:14-25, 121:9-20.

Libqual Fence informed Dima Fence of the parameters of the installation job required to be completed but did not provide instructions as to how to complete that job.[7]  Defs.' SOMF

_____

[7]     Plaintiffs dispute this fact on the basis that Defendants "have a 100% guarantee and if the work was not performed to Defendants' specifications, there would be ramifications. Management was frequently contacted."  Pls.' 56.1(b) Resp. ¶ 69.  Plaintiff's citations to the record do not support this response.  Rather, the record reveals that the "100% guarantee certificate" was merely to ensure the clients' satisfaction with the installation work.  Strianese Tr. 72:23-73:15.  Also, on the rare occasion that an installer did not obtain the customer's signature on the certificate, Libqual Fence did not reprimand the installer in any way as long the customer paid the balance owed for the installation work.  Juarez Tr. 34:14-35:11.  The installer received

¶ 69. Libqual Fence and its employees did not supervise the day-to-day work performed by Dima Fence and its employees, including Plaintiffs Monzano and Reyes. *Id*. ¶¶ 70-71. Generally, during the "busy" season of the year, once or twice a month, a Libqual Fence employee would come to a job site to check in on the progress of the installation job and ensure that Dima Fence had sufficient fencing material. Canales Tr. 57:24-58:8. Canales would contact Libqual Fence once to twice a week during the "busy" season of the year to relay a customer's disagreement with the description of the installation job provided to Dima Fence by Libqual Fence. *Id*. at 56:14-19. Once an installation job was completed, a Libqual Fence representative inspected Dima Fence's work at the job site. Pls.' COMF ¶ 46. Libqual Fence did not provide Dima Fence with specific deadlines to complete the installation jobs. Defs.' SOMF ¶ 72. However, Canales or another senior Dima Fence employee would contact Libqual Fence to advise whenever an installation job was complete. Pls.' COMF ¶ 45.

Libqual Fence provided Dima Fence's employees with Libqual Fence shirts and hats to wear at job sites but did not require that the shirts or hats be worn. Defs.' SOMF ¶ 73. Canales wore a Libqual Fence shirt at job sites. Pls.' COMF ¶ 43.

### 3. *Plaintiffs Monzano and Reyes*

Sometime in 2015, Canales met Monzano through a friend and extended a job offer to Monzano to work as a fence installer.[8] Defs.' SOMF ¶¶ 29-30; Transcript of July 9, 2019 Deposition of Walter Monzano-Moreno ("Monzano Tr."), annexed to Basso Decl. as Ex. I at

---

payment from the customer when the installation work was completed "pretty much all the time." *Id*. at 35:6-11.

[8] Plaintiffs dispute the entity that Monzano was hired to work for but do not provide any citations to the record which "specifically controvert" the fact that Canales directly offered Monzano work as a fence installer. Pls.' 56.1(b) Resp. ¶ 29.

16:24-17:24.  In June 2016, Canales met Reyes through Monzano and extended an offer to Reyes to work as a fence installer.[9]  *Id.* ¶ 31; Transcript of July 9, 2019 Deposition of Fernando Reyes ("Reyes Tr."), annexed to the Basso Decl. as Ex. E at 18:5-9, 20:11-12.  Prior to being offered a position by Canales, neither Monzano nor Reyes had met any of Libqual Fence's employees.  Monzano Tr. 22:21-23:5; Reyes Tr. 18:10-15; Canales Tr. 27:13-28:10.  Monzano and Reyes were paid on a weekly basis at a rate of $130 and $120 per day, respectively.[10]  Defs.' SOMF ¶¶ 37, 47.  Plaintiffs were notified directly by Canales what their rate of pay would be.  Monzano Tr. 29:20-24; Reyes Tr. 18:22-19:5.  Plaintiffs received their wages directly from Canales -- never from Libqual Fence -- every week.  Defs.' SOMF ¶ 53; Monzano Tr. 30:14-16.  According to Canales, he determined Plaintiffs' rates of pay and never discussed the payment of their wages with Libqual Fence.  Defs.' SOMF ¶¶ 38, 63.  Neither Monzano nor Reyes ever had conversations with Libqual Fence or its employees regarding their wages.  Defs.' SOMF ¶ 51.  Monzano received a 1099 and other tax forms from Dima Fence.  Defs.' SOMF ¶ 56; IRS Tax Form 1099, Basso Decl., Ex. I [65-10].  Canales testified that Reyes was a W-2 employee of Dima Fence; however, Reyes testified that he received tax forms which identified Libqual Fence as his employer.  Canales Tr. 120:2-7, Reyes Tr. 37:7-25.  Although Monzano received tax forms from Dima Fence, neither party submitted any evidence of tax forms received by Reyes.

[9]      Plaintiffs dispute the entity that Reyes was hired to work for but do not provide any citations to the record which "specifically controvert" the fact that Canales directly offered Reyes work as a fence installer.  Pls.' 56.1(b) Resp. ¶ 29.

[10]      There is no dispute that Monzano was paid in cash by Canales.  Defs.' SOMF ¶ 53.  However, there is a dispute based on the testimony of Canales and Reyes as to whether Canales paid Reyes by check, cash or both.  Defs.' SOMF ¶ 49; Pls.' 56.1(b) Resp. ¶ 49.  Defendants have not submitted copies of any checks received or deposited by Reyes.

Neither Monzano nor Reyes had any conversations with Libqual Fence and its employees regarding the terms of their employment.  Defs.' SOMF ¶ 52.  Canales advised Plaintiffs when to start work.  Defs.' SOMF ¶ 54.  At the start of the workday, Monzano and Reyes arrived at Liberty Fence's office and parked their vehicles in a parking lot located on the same street as Libqual Fence's office, but distinct from the Libqual Fence parking lot.  Monzano Tr. 24:18-23, 47:13-15, 50:22-51:6; Reyes Tr. 28:14-29:5.  Thereafter, Plaintiffs would load and unload materials onto Dima Fence's trucks and were then driven to the job site in Dima Fence's trucks. Monzano Tr. 58:14-59-2, 62:2-12, Reyes Tr. 29:14-29:25.  Plaintiffs loaded and unloaded Dima Fence's trucks at the direction of Canales or other senior Dima Fence employees.  Defs.' SOMF ¶ 55.  At the end of the workday, Monzano and Reyes returned to Libqual Fence's office and departed in their own vehicles.  Monzano Tr. 63:24-64:13, Reyes Tr. 42:2-16.  Monzano typically wore a Libqual Fence hat or shirt to work.  Monzano Tr. 65:23-66:2.  Reyes never wore a Liberty Fence hat or shirt to work.  Defs.' SOMF ¶ 74.

Sometime at the end of 2017, Monzano advised Canales and Juarez that he no longer intended to work as a fence installer due to an injury he suffered.  Defs.' SOMF ¶¶ 36, 43; Monzano Tr. 37:10-38:7.   In October 2016, Reyes advised Canales that he longer intended to work as a fence installer because "work was slow and [Reyes] needed work."  Defs.' SOMF ¶ 44; Reyes Tr. 21:23-22:7.

### C.   Procedural History

On January 10, 2018, Plaintiffs commenced the instant action against corporate Defendants Libqual Fence and Dima Fence and individual Defendants Strianese, Juarez, and Canales.  *See generally* Compl.  On July 24, 2019, Plaintiffs filed their Second Amended Complaint asserting causes of action under the FLSA and the NYLL alleging retaliation, failure

to pay overtime and spread of hours wages, and failure to provide wage notices and statements. *See generally* SAC.  Plaintiffs also asserted claims for violation of NYCAC 20-929, otherwise known as the Freelance Isn't Free Act ("FIFA").[11]  *Id*.

On July 30, 2019, the Court extended the previous July 31, 2019 discovery deadline to August 6, 2019, solely for the completion of the Defendants' depositions; all other discovery remained closed.  *See* July 30, 2019 Electronic Order.  On February 28, 2020, Dima C. Fence, Inc. and Dima Canales were dismissed from the action by stipulation of the parties.  *See* DE 63-64.  Defendants Libqual Fence, Strianese, and Juarez filed a fully briefed motion for summary judgment on May 11, 2020.[12]  *See* Defs.' Mem.; Defs.' Reply.  Plaintiffs oppose the motion.  *See* Pls.' Opp'n.  Judge Brodie referred Defendants' motion for summary judgment to this Court for a Report and Recommendation as to whether the motion should be granted.  *See* May 15, 2020 Electronic Order.

### III.  STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving

---

[11]    Essentially, Plaintiffs assert that if they are not classified as employees of Defendants and work was performed within the geographic boundary of New York City, then they would be considered freelance workers as that term is defined in NYCAC 20-927.  As such, Plaintiffs claim that defendants failed to pay them the proper overtime wages to which they are entitled under the NYLL and the supporting New York State Department of Labor Regulations.  *See* SAC ¶¶ 135-142.

[12]    Initially, Defendants omitted their memorandum of law in support of the motion for summary judgment.  *See* DE 70.  After the Court brought this omission to the attention of the parties, Defendants advised that the omission was inadvertent and filed their memorandum of law.  *See* December 10, 2020 Electronic Order; Defs.' Mem.  Notwithstanding its initial omission from the bundled motion, the Court in its discretion has accepted and considered the Defendants' memorandum of law.

party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005). In dispatching this task, a court need only consider admissible evidence. *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*, No. 09-CV-5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 273; *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor."). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The

Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).

## IV.   DISCUSSION

Defendants seek summary judgment on the grounds that they cannot be held liable as "joint employers" for any violations of the FLSA and NYLL.  Defs.' Mem. at 10-21.  Defendants contend that they do not qualify as Plaintiffs' "employer" within the meaning of both statutes. *Id*.  Moreover, Defendants seek summary judgment on Plaintiffs' FIFA claim on the grounds that the NYCAC § 20-929 is facially inapplicable in the instant circumstances.  *Id*. at 22.  The Court will address each issue in turn below.

### A.   Joint Employer

The FLSA imposes liability on the "employer" of any person who violates the statute's minimum wage, overtime, and retaliation provisions.  *See* 29 U.S.C. §§ 216(b), (e)(2).  The FLSA defines "employer" as an entity "acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The term includes "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."  *See* 29 U.S.C. §§ 203(a), (d).

The Second Circuit has held that an employment relationship exists under the FLSA when the "economic reality" is such that the "alleged employer possessed the power to control the workers in question." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (citing *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).  An entity need not possess "formal control" over a worker to qualify as an employer; rather, the entity may simply exercise "functional control" over the worker. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d

Cir. 2003).  Additionally, a worker performing a task may simultaneously do so on behalf of more than one "joint employer."  29 C.F.R. § 791.2; *Zheng*, 355 F.3d at 66 (citing 29 C.F.R. § 791.2).  When two or more entities operate as joint employers of a given worker, each employer is jointly and severally liable for the FLSA violations of all other joint employers.  *See Ansouman v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 196 (S.D.N.Y. 2003) ("Both Duane Reade and the Hudson/Chelsea defendants were the 'employers' of the plaintiffs under [the FLSA and the NYLL], [and are] jointly and severally obligated for underpayments of minimum wage and overtime."); 29 C.F.R. §§ 791.2(a)–(b).  A joint employment relationship does not exist if the alleged joint employers "are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee."  *Id.* at § 791.2(a).

The Second Circuit has developed three tests for determining whether a person or entity is an employer, including a joint employer.  *See Greenawalt v. AT& T Mobility LLC*, 642 Fed. App'x 36, 37 (2d Cir. 2016) (citing *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 142–43 (2d Cir. 2008)).  The first test was articulated in *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) and looks to whether an employer exercised "formal control" over a worker.  Under this test, a court considers whether an entity:  "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Id.* at 12 (citation omitted).  "[W]hen an entity exercises those four prerogatives, that entity, in addition to any primary employer, must be considered a joint employer."  *Zheng*, 355 F.3d at 67.  Because *Carter* defines employment more narrowly than the FLSA requires, satisfying this test is sufficient, but not necessary, to show joint employment.  *Id.* at 71.

17

A second test, articulated in *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir. 1988), is "more relevant for distinguishing between independent contractors and employees," *Velez v. Sanchez*, 693 F.3d 308, 326 (2d Cir. 2012), because the focus is on whether "the workers depend upon someone else's business ... or are in the business for themselves," *Brock*, 840 F.2d at 1059.  Under this test, a court considers whether:  "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business."  *Id*.  Contrary to Plaintiffs' assertion, the *Brock* test does not apply here where the issue raised is by what entity Plaintiffs were employed as opposed to whether Plaintiffs were employees or independent contractors.  *See Greenawalt*, 642 Fed. App'x at 37 ("The second test, set out in *Brock ...*, is 'typically more relevant for distinguishing between independent contractors and employees,' than for determining by whom workers who are assumed to be employees are employed.") (internal citations omitted); *Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 451 (S.D.N.Y. 2019) (finding the *Brock* test inapplicable since it is "more relevant for distinguishing between independent contractors and employees, because the focus is on whether "the workers depend upon someone else's business ... or are in the business for themselves") (internal citations omitted).

Moreover, in relying on a footnote in *Chen v. St. Beat Sportswear, Inc.,* 364 F. Supp. 2d 269 (E.D.N.Y. 2005), Plaintiffs mistakenly assert that the test set out in *Brock* somehow supplanted the *Carter* test.  Pls.' Opp'n at 19-20.  Plaintiffs appear to draw the conclusion that the *Carter* test has been invalidated based on a portion of a footnote in *Chen* which states that the Second Circuit in *Zheng* held that the district court erred by applying exclusively the four *Carter*

18

factors.  *Id*.  However, notwithstanding this holding, *Zheng* did not invalidate the *Carter* test.
*See Greenawalt*, 642 Fed. App'x at 37 (recognizing the *Carter* test as among the "three tests—
or, more accurately, three sets of factors—to guide [the] determination of whether a joint
employment relationship exists").  Rather, *Zheng* clarified that while the four factor *Carter* test
"can be *sufficient* to establish employer status … [it is not] *necessary* to establish an employment
relationship."  *Zheng*, 355 F.3d at 69.  Where other relevant factors that bear on the relationship
between workers and potential joint employers exist, *Zheng* held that those factors must be
considered and the court cannot limit its analysis *solely* to the formal control test set out in
*Carter*.  *Id*. at 68-69 (A court must "look beyond an entity's formal right to control the physical
performance of another's work before declaring that the entity is not an employer under the
FLSA.").

The court in *Zheng* proceeded to outline a third test which weighs six "nonexclusive and
overlapping" factors to determine whether an employer had "functional control" over workers.
*Id*. at 71-76.  Case law has recognized that the *Zheng* factors "are most relevant in the context of
subcontractor relationships."  *Granda v. Trujillo*, No. 18-CV-3949, 2019 WL 367983, at *5
(S.D.N.Y. Jan. 30, 2019) (citing *Greenawalt*, 642 Fed. App'x at 37); *Fernandez*, 407 F. Supp.
3d. at 451.  *Zheng* involved a garment manufacturer who contracted with other entities to have
workers stitch and finish pieces of clothing.  *Zheng*, 355 F.3d at 63.  To determine whether the
manufacturer was a joint employer with the contractors, the court in *Zheng* looked to:

> (1) whether [the manufacturer]'s premises and equipment were used for the
> plaintiffs' work; (2) whether the Contractor Corporations had a business that could
> or did shift as a unit from one putative joint employer to another; (3) the extent to
> which plaintiffs performed a discrete line-job that was integral to [the
> manufacturer]'s process of production; (4) whether responsibility under the
> contracts could pass from one subcontractor to another without material changes;
> (5) the degree to which the [the manufacturer] or their agents supervised plaintiffs'

19

work; and (6) whether plaintiffs worked exclusively or predominantly for the [the manufacturer].

*Zheng*, 355 F.3d at 72.  *Zheng* makes clear that not every factor needs to weigh against joint employment in order for a defendant to be entitled to summary judgment.  *Id*. at 77.  In *Barfield*, the Second Circuit warned that there is "no rigid rule for the identification of an FLSA employer," and instead applied the "nonexclusive and overlapping [*Carter* and *Zheng*] factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA."  *Murphy v. Heartshare Human Servs. of New York*, 254 F. Supp. 3d 392, 397 (E.D.N.Y. 2017) (citing *Barfield,* 537 F.3d at 143 (internal quotation marks and citation omitted)).  In assessing whether an entity is a joint employer, the determination of "the historical findings of fact that underlie each of the relevant factors" and "the findings as to the existence and degree of each factor" are "findings of fact," while "the conclusion ... to be drawn from applying the factors, *i.e.*, whether an entity is a joint employer," is a question of law.  *Id.* at 76.

With respect to the NYLL, its definition of "employer" is nearly identical to that of the FLSA.  *Compare* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee....") *with* NYLL § 190(3) ("'Employer' includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service.").  As a result, "[c]ourts regularly apply the same tests to determine whether entities are joint employers for purposes of the FLSA and NYLL."  *Granda*, 2019 WL 367983, at *5 (citing *Ocampo v. 455 Hosp. LLC*, No. 14-CV-9614, 2016 WL 4926204, at *5 n.7 (S.D.N.Y. Sept. 15, 2016)); *see also Olvera v. Bareburger Group LLC*, 73 F. Supp. 3d 201, 206 (S.D.N.Y. 2014) ("The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA."); *Berrios*

*v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 393 n.19 (E.D.N.Y. 2012) ("The definition of employer is equally expansive under New York Law and the economic reality test is used to determine whether an individual is an employer under both federal and state law.") (citations omitted); *Chen*, 364 F. Supp. 2d at 278 (Courts in this circuit "hold that the New York Labor Law embodies the same standards for joint employment as the FLSA."). Accordingly, this Court's conclusions with respect to Defendants' status as employers under the FLSA apply equally to their status as employers under the NYLL.

### 1.   *Formal Control Test*

#### i.  Hiring and Firing

The first *Carter* factor examines whether the putative joint employer "had the pwer to hire and fire employees." *Carter*, 735 F.2d at 12. As to hiring, Defendants have submitted testimony from Canales that Libqual Fence was not involved in the hiring of any of Dima Fence's employees. Canales Tr. 84:2-8, 89:19-23. Testimony from Plaintiffs and Canales demonstrates that Canales directly met with and extended work to Plaintiffs as fence installers. Defs.' SOMF ¶¶ 29-31; Monzano Tr. 16:24-17:24; Reyes Tr. 18:5-9, 20:11-12. Prior to being offered positions by Canales, Plaintiffs did not meet or communicate with any of Libqual Fence's employees, including Strianese and Juarez. Monzano Tr. 22:21-23:5; Reyes Tr. 18:10-15; Canales Tr. 27:13-28:10. Plaintiffs have not pointed to any evidence which supports a finding that Defendants had control over or involvement in Dima Fence's hiring process. The only evidence Plaintiffs have submitted relevant to this issue is Monzano's testimony that he "believed" he was hired to work for Libqual Fence. Pls.' COMF ¶ 54. This belief is based on testimony that "Dima [Canales] told [Monzano] that he worked for [Libqual] Fence and then asked … if [Monzano] would like to work with [him] at [Libqual] Fence." Monzano Tr. 17:25-

21

18:25.  This testimony conflicts with Monzano's subsequent testimony that he "was hired by Dima Canales to work with Dima Canales."  Monzano Tr. 22:24-25.  Further, Reyes testified Canales advised him that Dima Fence was a subcontractor when Canales offered him work as a fence installer.  Reyes Tr. 18:3-4, 20:11-2.  Taking this information as a whole, the evidence in the record supports a finding that Defendants did not have the power to hire Dima Fence's employees.  *See Martin v. Sprint United Mgmt. Co*., 273 F. Supp. 3d 404, 423 (S.D.N.Y. 2017) (finding the alleged employer did not have the power to hire subcontractor's employees when the subcontractor scheduled and conducted interviews, made hiring decisions, and extended offers of employment); *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011) (finding the alleged employer did not have the power to hire subcontractor's employees when it did not receive applications from putative employees, interview or review applicants, inform applicants that they were hired, provide new hires with employment forms, or meet with or communicate with any of the alleged employer's employees prior to being hired).

With respect to firing, Defenants have offered little evidence on this issue presumably, in part, because neither Monzano nor Reyes was fired.  Nonetheless, Canales testified that Libqual Fence did not have the authority to fire Dima Fence's employees, Defs.' SOMF ¶ 62, while Plaintiffs have not refuted this testimony.

Accordingly, the Court finds that the first formal control factor weighs against a finding of joint employment.

### ii.  Work Schedule or Conditions of Employment

The second *Carter* factor examines whether the purported joint employer "supervised and controlled employee work schedules or conditions of employment."  *Carter,* 735 F.2d at 12.  The more supervision and control an entity exercises, the more likely it is an employer.  *Zheng*, 355

F.3d at 74-75. But "the law does not require an employer 'to look over his workers' shoulders every day in order to exercise control." *Barfield*, 537 F.3d at 147 (quoting *Brock*, 840 F.2d 1054, 1060 (2d Cir. 1988)). "[J]oint employer status may be found even where control is exercised only occasionally." *Vasto v. Credico (USA) LLC*, 2017 WL 4877424, at *9 (S.D.N.Y. Oct. 27, 2017) (internal quotation marks and citations omitted), *aff'd*, 767 Fed. App'x 54 (2d Cir. 2019).

Defendants have submitted evidence that Dima Fence, not Defendants, supervised and controlled Plaintiffs' work schedules and conditions of employment. It is undisputed that the Plaintiffs never had any conversations with Libqual Fence and its employees regarding the terms of their employment. Defs.' SOMF ¶ 52. Canales informed Dima Fence's employees, including Plaintiffs, what work they had, the days they were required to work, and the time they were directed to report to work. Defs.' SOMF ¶¶ 18, 54. Libqual Fence provided Dima Fence general information regarding the fence installation job required to be completed, but it did not provide Dima Fence and its employees with any specific instructions as to how or when to complete the installation job. Defs.' SOMF ¶¶ 69, 72. The work Dima Fence's employees performed at Libqual Fence's office, including the loading and unloading of Dima Fence's trucks, was performed at the direction of Canales or another senior Dima Fence employee. Defs.' SOMF ¶ 55. At the actual job site, Plaintiffs were supervised by senior Dima Fence employees. Reyes Tr. 25:8-14; Monzano Tr. 53:8-25. It is also undisputed that Defendants did not supervise Plaintiffs' day-to-day work. Defs.' SOMF ¶¶ 70-71.

Plaintiffs draw attention to the fact that Libqual Fence occasionally monitored Dima Fence's progress and inspected its completed work. Pls.' Opp'n at 16. For instance, once or twice a month, a Libqual Fence employee would come to the job site Dima Fence was working

at to check in on the progress of the installation job and to ensure that Dima Fence had sufficient

fencing material.  Canales Tr. 57:24-58:8.  After each installation job was completed, Libqual

Fence also inspected Dima Fence's work and required Dima Fence to obtain the client's

signature on a customer satisfaction certificate.  Pls.' COMF ¶ 46; Canales Tr. 74:11-24; Juarez

Tr. 34:2-9.  While this conduct may demonstrate that Libqual Fence exercised some measure of

quality control, it does not demonstrate that it exercised control over the day-to-day schedule and

work conditions of Dima Fence's employees.  *See Martin*, 273 F. Supp. 3d a 427 ("That Sprint

may have conducted or directed evaluations of field agents, monitoring their productivity and

compliance, does not establish control, as such quality control efforts differ from day-to-day

control."); *Hugee v. SJC group, Inc.*, No. 13-CV-0423, 2013 WL 4399226, at *5-6 (S.D.N.Y.

Aug. 14, 2013) (holding that supervision for purposes of quality control does not support a

finding of joint employer status).  "Exercising quality control by having strict standards and

monitoring compliance with those standards does not constitute supervising and controlling

employees work conditions."  *Godlewska v. HDA*, 916 F. Supp. 2d 246, 259 (E.D.N.Y.

2013), *aff'd sub nom. Godlewska v. Human Dev. Ass'n, Inc.*, 561 Fed. App'x 108 (2d Cir. 2014);

*see also Chen*, 364 F. Supp. 2d at 286 ("[T]he Court will not consider evidence plaintiffs present

with respect to this factor to the extent it concerns the presence of … quality control

personnel.").  "Courts instead have distinguished between circumstances where the putative joint

employer maintains specific standards to which [its contractors] and [the contractors' employees]

must adhere, and regularly monitors the [contractor's employees] to ensure that their

performance satisfies [the putative joint employer's] expectations, which does not itself establish

control of work conditions, and circumstances where the putative joint employer is responsible

for the day-to-day management of the [contractor's employees]."  *Vasto*, 2017 WL 4877424, at

*10 (internal quotations omitted) (citing *Lawrence v. Adderley Indus., Inc.*, No. 09-CV-2309, 2011 WL 666304, at *9 (E.D.N.Y. Feb. 11, 2011)).

Plaintiffs also point to the fact that Canales contacted Libqual Fence once or twice a week during the "busy" season to relay a client's disagreement with the description of the installation job provided to Dima Fence by Libqual Fence.  *See* Pls.' Opp'n at 10, 16.  Without more, however, the fact that a contractor communicates with a putative joint employer does not support an inference of supervision and control.  *See Jean-Louis,* 838 F. Supp. 2d at 128 (finding that "evidence that Metro technicians communicate with Time Warner while performing their work … is not evidence that Time Warner controls how Metro technicians do their jobs; it is merely a function of the fact that Metro technicians install Time Warner cable").

Lastly, Plaintiffs point to the fact that some Dima Fence employees wore Libqual Fence shirts and hats and that Dima Fence's trucks had Libqual Fence signs on them until 2017.  Pls.' Opp'n at 7, 10.  This, however, does not necessarily imply that an employment relationship existed with Libqual Fence.  *See Lawrence*, 2011 WL 666304, at *8 ("Nor does the requirement that Adderley's technicians wear uniforms and identification badges identifying themselves as being associated with Cablevision render them employees of Cablevision.  The requirement to wear such identifying materials 'does not affect the economic reality of the relationship [between Adderley and Cablevision], but merely allows consumers to be assured of [the technicians'] *bona fides.*'") (citation omitted).

Accordingly, notwithstanding Libqual Fence's arguably minimal supervision over Dima Fence's employees, the second formal control factor weighs against a finding of joint employment.  *See Vasto,* 2017 WL 4877424, at *11 ("At bottom, Credico exercised no more

25

than minimal control over plaintiffs' work.  Absent meaningful control over plaintiffs' schedules or conditions of employment, the second formal factor inclines strongly in Credico's favor.").

### iii.   Rate and Method of Payment

The third *Carter* factor examines whether the putative joint employer "determined the rate and method of payment."  *Carter,* 735 F.2d at 12.  Here, the undisputed evidence demonstrates that Defendants were not involved in the determination of Plaintiffs' rate and method of payment.  Plaintiffs both testified that it was Canales who notified them of their rate of pay.  Defs.' SOMF ¶ 51; Monzano Tr. 29:20-24; Reyes Tr. 18:22-19:5.  They never had any conversations with Libqual Fence and its employees regarding their pay.  *Id.*  Plaintiffs also testified that they were paid a fixed daily rate regardless of the hours they worked, Defs.' SOMF ¶¶ 37, 47, and received their pay directly from Canales each week, Defs.' SOMF ¶ 53; Monzano Tr. 30:14-16.  Canales testified that he determined Plaintiffs' rates of pay and never discussed the payment of their wages with Libqual Fence.  Defs.' SOMF ¶¶ 38, 63.

Moreover, it is undisputed that Libqual Fence paid its employees hourly and through a third-party payroll processing company which provided pay stubs documenting their employees' wage details.  Strianese Decl. ¶ 12; Defs.' SOMF ¶ 67.  The fact that Plaintiffs' rate and method of payment differed from Libqual Fence's employees further supports the finding that Dima Fence, not the Defendants, determined Plaintiffs' rate of pay and method of payment.  *C.f. Barfield v. New York City Health & Hosps. Corp.,* 537 F.3d 132, 144 (2d Cir. 2008) (finding that the putative joint employer exercised some control over employees' pay where the putative joint employer paid a fixed hourly rate to the contractor for each hour of labor and the contractor, in turn, paid its employees an hourly rate for the exact same hours).  In their response to Defendants' Rule 56.1 statement, Plaintiffs appear to argue that Libqual Fence exerted control

26

over Plaintiffs' rates of pay because these rates were ultimately dependent on the rates Libqual

Fence paid Dima Fence per post installed.  Pls.' Resp. ¶ 40.  "To be sure, any company A that

provides revenue to company B affects what company B pays its employees, but the test is

whether a putative joint employer *determines* pay rates, not whether it *affects* them."  *Jean-*

*Louis,* 838 F. Supp. 2d at 128 (emphasis added).  To infer joint employment from the latter

circumstance "would dramatically expand the FLSA to subsume traditional independent

contractor relationships."  *Id*. (citation omitted).

Accordingly, the third formal control factor weighs against a finding of joint

employment.

### iv.   Maintenance of Employment Records

The final *Carter* factor looks to whether the purported joint employer "maintained

employment records."  *Carter*, 73 F.2d at 12.  For FLSA overtime claims, "the matter most

relevant ... [is] hours worked."  *Jean-Louis,* 838 F. Supp. 2d at 128 (quoting *Barfield,* 537 F.3d at

144).  Here, Canales testified that he kept track of Plaintiffs' time by writing down the days

Plaintiffs worked.  Defs.' SOMF ¶ 65; Canales Tr. 68:14-25, 121:9-20.  Although Plaintiffs

appear to dispute whether any of these handwritten records were preserved, they have not

pointed to any evidence in the record which supports a finding that Defendants maintained

Plaintiffs' employment records.  Pls.' Resp. ¶ 65.  "[T]his is not a case where a putative joint

employer 'signs off on' time sheets completed by each plaintiff, 'verifies the number of hours

worked by each' plaintiff and 'then provides records of the hours worked' to the plaintiff's

contractor employer who uses the records to compensate the plaintiff on a per-hour basis."  *Jean-*

*Louis*, 838 F. Supp. 2d at 130 (quoting *Barfield*, 537 F.3d at 136).  The fact that Libqual Fence

tracked its employees' time using a fingerprint time system and utilized a third-party payroll

processing company which provided its employees with pay stubs documenting their wages, but that Defendants assert they did not receive any wage notices, also supports an inference that Defendants did not maintain Plaintiffs' employment records.  Strinese Decl. ¶ 12; Defs.' SOMF ¶ 67.  The final formal control factor therefore weighs against a finding of joint employment.

Drawing all factual inferences in favor of Plaintiffs, the four *Carter* factors weigh against a finding of joint employment here.  Satisfying the four *Carter* factors "may be sufficient to establish joint employment under the FLSA [but] it is not necessary to establish joint employment."  *Zheng*, 355 F.3d at 79; *see also Greenawalt*, 642 Fed. App'x at 37 ("satisfying [the formal control] test is sufficient, but not necessary, to show joint employment.").  Therefore, the six factors in *Zheng* must also be analyzed to determine whether Defendants exercised "functional control" over Plaintiffs.  *See Fernandez*, 407 F. Supp. 3d at 456 (considering the six factors in *Zheng* after the *Carter* factors did not weigh in favor of finding formal control); *Thomas v. River Greene Constr. Grp. LLC*, No. 17-CV-6954, 2018 WL 6528493, at *8 (S.D.N.Y. Dec. 11, 2018) (same); *Martin,* 273 F. Supp. 3d at 429 (same); *Vasto*, 2017 WL 4877424, at *12.

## 2.   *Functional Control Test*

### i.   **Premises and Equipment**

The first *Zheng* factor examines "whether a putative joint employer's premises and equipment are used by its putative joint employees."  *Zheng*, 355 F.3d at 72.  This factor "is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work."  *Id*.  "Although ... shared premises … is [not] anything close to a perfect proxy for joint employment (because they are … perfectly consistent with a legitimate subcontracting relationship), the factfinder can use

28

these readily verifiable facts as a starting point in uncovering the economic realities of a business relationship." *Id*.  With respect to Libqual Fence's equipment, it is undisputed that Dima Fence used its own machines, tools, and trucks -- not Libqual Fence's -- when performing fence installation work for Libqual Fence.  Defs.' SOMF ¶¶ 77-78, 80; Strianese Tr. 65:18-66:6; Juarez Tr. 24:7-10.  Dima Fence owned two trucks which were insured by and registered to Dima Fence.  Defs.' SOMF ¶ 79.  Libqual Fence owned its own trucks which Dima Fence's employees did not use.  Defs.' SOMF ¶ 80; Strianese Tr. 65:18-66:6; Juarez Tr. 24:7-10.  Pointing to the undisputed fact that Dima Fence's trucks displayed Libqual Fence's company sign on them until 2017, Plaintiffs argue that the trucks were "in effect" Libqual Fence's trucks.  Pls.' Opp'n at 14. However, Plaintiffs fail to cite any legal authority which supports this argument, and the record does not demonstrate that the trucks' signage actually impacted Dima Fence's ownership or control over these trucks.

The record also shows that Dima Fence was responsible for obtaining and purchasing materials such as cement and sand for the installation work.  Defs.' SOMF ¶ 82; Canales Tr. 37:20-38:13.  The fact that Libqual Fence supplied Dima Fence with manufactured fence posts is of no consequence because these posts are "not tools used to complete the service or finish the product; they are uncompleted versions of the service or product." *Jean-Louis*, 838 F. Supp. 2d at 132.

With respect to Libqual Fence's premises, it is undisputed that Libqual Fence's office was used by Dima Fence's senior employees daily to obtain written information regarding the installation jobs, to park Dima Fence's trucks overnight, and to load and unload the trucks with fencing material and debris. Canales Tr. 28:15-34:25, 48:25-49:25, 54:20-55:4; Monzano Tr. 24:18-23, 47:13-15, 50:22-51:6, 58:14-59-2, 62:2-12; Reyes Tr. 28:14-29:25.  It also served as

the arrival and departure location.  *Id*.  On the other hand, the bulk of the work Plaintiffs'

performed was off premises on the respective client's property.  *Id*.

The fact that Dima Fence used its own equipment and performed the bulk of its

installation work off-site strongly weighs against a finding of joint employment.  However, Dima

Fence's limited but daily use of the premises at Libqual Fence for its employees to report to

work and load/unload Dima Fence's trucks weighs slightly in favor of finding joint employment.

Accordingly, while this factor potentially weighs against a finding of functional control, it is

ultimately inconclusive.  *See Vasto*, 2017 WL 4877424, at *13 ("This functional control factor is

therefore inconclusive. Credico's separate premises weigh against a finding of functional control,

but plaintiffs' use of Credico equipment weighs in favor.").

### ii.  Shifting as a Unit

The second *Zheng* factor looks to whether Dima Fence "had a business that could or did

shift as a unit from one putative joint employer to another."  *Zheng*, 355 F.3d at 72.  This factor

"is relevant because a subcontractor that seeks business from a variety of contractors is less

likely to be part of a subterfuge arrangement than a subcontractor that serves a single

client."  *Zheng*, 355 F.3d at 72.  The "absence of a broad client base," like "shared premises," is

not "anything close to a perfect proxy for joint employment (because they are both perfectly

consistent with a legitimate subcontracting relationship)."  *Id*.

It is undisputed that Dima Fence exclusively performed work for Libqual Fence during

the relevant time period.  Canales Tr. 22:12-15; Pls.' COMF ¶¶ 27-30.  Defendants contend the

record nonetheless supports a finding that Dima Fence was a business that *could* have shifted as

a unit from one putative joint employer to another based on such undisputed facts as that Dima

Fence had its own equipment, vehicles, and employees and, in fact, did shift as a unit to another

30

company after it stopped performing work for Libqual Fence in 2017. Defs.' Mem. at 17-18.
Under similar circumstances, the court in *Jean-Louis* found that a subcontractor could have
shifted as a unit to another putative joint employer which weighed against a finding of joint
employment. *See Jean-Louis,* 838 F. Supp. 2d at 128 (finding the second *Zheng* factor weighed
against a finding of joint employment where the contractor had its own resources, *i.e.*,
warehouse, tools, vehicles, and a cadre of employees, was able to seek work from other
companies, and provided installation services for another company in the past). Here, however,
the undisputed fact that Dima Fence did not possess a consumer affairs license to perform home
improvements, including fence installations, in Nassau and Suffolk Counties or New York City
until 2017, Pls.' COMF ¶¶ 1-12, and that Canales had to be employed directly by Libqual Fence
when Dima Fence had certain "insurance issues," Juarez Tr. 17:4-10 Strianese Tr. 45:24-46:7,
98:25-99:17, weighs against a finding that Dima Fence could have shifted as a unit to another
contactor during the relevant time. Therefore, this factor, too, is inconclusive.

### iii. Discrete Line-Job Integral to the Business

The third *Zheng* factor analyzes "the extent to which plaintiffs performed a discrete line-
job that was integral to [the putative joint employer]'s process of production." *Zheng*, 355 F.3d
at 72. "Interpreted broadly, this factor could be said to be implicated in *every* subcontracting
relationship, because all subcontractors perform a function that a general contractor deems
'integral' to a product or service." *Id.* at 73 (emphasis in original). However, the Second Circuit
has "not interpret[ed] the factor quite so broadly." *Id.* Rather, this factor is examined on a
spectrum spanning from, on the one end, "piecework on a producer's premises that requires
minimal training or equipment, and which constitutes an essential step in the producer's
integrated manufacturing process," to the other end, namely, "work that is not part of an

31

integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology." *Id.*

Some courts "have questioned whether this factor translates well outside of the production line employment situation." *Fernandez*, 407 F. Supp. 3d at 457–58 (collecting cases). Nonetheless, this factor should not be ignored given the fact that it has been applied by courts, including the Second Circuit, outside the production line context. *Id.* (collecting cases). Plaintiffs contend that they "performed work that was integral to the operation of Defendants['] enterprise" because "[w]ithout their labor, the enterprise could not profit." Pls.' Opp'n at 15. Plaintiffs have not pointed to, and the Court has not identified, any evidence in the record which supports a finding that Libqual Fence "could not profit" without Plaintiffs' installation work. It is undisputed that Libqual Fence is involved in both the manufacturing and installation of fences. Defs.' SOMF ¶ 1. Yet, Plaintiffs have not submitted any evidence that Libqual Fence solely profited from the installation aspect of its business and, if it did, that Plaintiffs' installation work was the predominant source of those profits. While Dima Fence's work for Libqual Fence may have been important to Libqual Fence and generated revenue for it, there is no evidence in the record to support that Dima Fence's work was necessarily "integral" to Libqual Fence's business. *See Thomas*, 2018 WL 6528493, at *8 (finding that although the parties did not extensively develop the putative joint employer's business interests, the fact that it had a separate area of gainful business precluded, "other than speculatively, the conclusion that the [subcontractor's projects] in general, or plaintiffs' [carpentry and painting] work on them in particular, was 'integral' to [the putative joint employer's] business"). Nevertheless, where, as here, the work performed is more comparable to a service, rather than a discrete line job, the third functional control factor does not weigh in favor of finding joint employment, even if the

work performed may in some sense be integral to the putative joint employer because revenue is derived from it.  *See Jean–Louis,* 838 F. Supp. 2d at 134 ("[T]he third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service [*i.e.*, installations for cable companies] rather than manufacturing a product."); *Martin*, 273 F. Supp. 3d at 438 ("Given the nature of plaintiffs' work, as providers of a service rather than as discrete line job workers, the third functional control factor also does not favor a finding of functional control."); *Vasto,* 2017 WL 4877424, at *14 ("The facts here do not signal joint employment.  To be sure, field agents' work is in some sense integral to Credico's business: field agents solicit customers, and Credico ultimately derives its revenue from those face-to-face interactions.  But the marketing and outreach services that the field agents provide are ultimately just that, services, rather than discrete line jobs.").

Even where the work performed by a subcontractor's employees has been closely akin to a line job, the Second Circuit has "resist[ed] the temptation to say that any work on a so-called production line—no matter what product is being manufactured—should attract heightened scrutiny."  *Martin*, 273 F. Supp. 3d at 438 (quoting *Zheng,* 355 F.3d at 73).  Rather, the Second Circuit has reasoned that, "insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws."  *Id*. (quoting *Zheng,* 355 F.3d at 73).  Here, the evidence as to industry custom is limited. Defendants have offered Canales' testimony that outsourcing installation work is common in the fencing industry.  *See* Defs.' SOMF ¶ 11.  Plaintiffs have not submitted, and the Court has not identified, any evidence in the record which refutes this testimony.

Accordingly, this third factor weighs against a finding of joint employment.  *See Vasto,* 2017 WL 4877424, at *14 ("Given the nature of plaintiffs' work as providers of a service and the

ubiquity of outsourcing in the relevant industry, the third functional control factor does not favor

a finding of functional control.").

### iv.  Transfer of Responsibility

The fourth *Zheng* factor examines whether "responsibility under the contracts could pass

from one subcontractor to another without material changes."  *Zheng*, 355 F.3d at 74.  This factor

"asks not whether all of the putative joint employer's contractors do the same work but whether,

if the putative joint employer hired one contractor rather than another, 'the *same* employees

would continue to do the *same* work in the *same* place.'"  *Jean–Louis*, 838 F. Supp. 2d at 135

(quoting *Zheng*, 355 F.3d at 74) (emphasis in original).  This factor also raises the "subterfuge"

issue because "when employees are tied to an entity ... rather than to an ostensible direct

employer such as the [contractor,] [i]n such circumstances, it is difficult *not* to draw the

inference that a subterfuge arrangement exists.  Where, on the other hand, employees work for an

entity (the purported joint employer) only to the extent that their direct employer is hired by that

entity, this factor does not in any way support the determination that a joint employment

relationship exists."  *Fernandez,* 407 F. Supp. 3d at 458–59 (emphasis in original) (quoting

*Zheng*, 355 F.3d at 74).

Defendants contend that after Dima Fence stopped performing work for Libqual Fence,

no Dima Fence employees, including Plaintiffs, continued installing fences for Libqual Fence.

Defs.' Mem. at 20.  Although this factor would lend support to a finding that Dima Fence's

employees worked for Libqual Fence "only to the extent that their direct employer is hired by

that entity," Defendants do not cite to any evidence in the record which supports their factual

contention.  *Zheng,* 355 F.3d at 74; *see also Rutherford Food Corp. v. McComb*, 331 U.S. 722,

725, 730, 67 S. Ct. 1473, 1475 1477 (1947) (finding that the responsibility under contracts

passed without material change because, even after supervisors left their positions and contracts were abandoned, individual boners continued to work for the slaughterhouse).  Having reviewed the record, the Court has not readily identified any evidence that Dima Fence's employees would continue installing fences for Libqual Fence if Dima Fence severed its relationship with Libqual Fence.  Plaintiffs also do not point to any evidence in the record that would support such a finding but rather appear to concede that this factor does not necessarily support a finding of joint employment.  *See* Pls.' Opp'n at 16 ("[I]t is questionable whether the same Plaintiffs would perform the same work regardless of whether Dima Fence or another entity had responsibility for the contract.").

Accordingly, the fourth formal control factor does not support a finding of joint employment.

### v.  Degree of Control and Supervision

The fifth *Zheng* factor assesses "the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work."  *Zheng,* 355 F.3d at 72.  As discussed under Section IV.A.1.ii in connection with the second *Carter* factor, Plaintiffs have not submitted any evidence sufficient to support a finding that Defendants played a meaningful role in supervising Plaintiffs. "The inquiry under this factor is 'largely the same' as the inquiry under the second [formal control] factor and is the most relevant factor in determining whether a purported joint employer exercises functional control over plaintiffs."  *Godlewska,* 916 F. Supp. 2d at 264 (quoting *Jean–Louis,* 838 F. Supp. 2d at 126 n.7).  Although "there is evidence that [Libqual Fence] supervised [Dima Fence's employees] in some minimal capacity[,]... on balance, even considering all of the evidence in the light most favorable to Plaintiffs," this functional control factor cannot support a finding that Defendants jointly employed Plaintiffs.  *Jean–Louis,* 838 F. Supp. 2d at 135.

### vi.   Exclusively or Predominantly

The sixth functional control factor looks to "whether plaintiffs worked exclusively or predominantly for [the putative employer]." *Zheng*, 355 F.3d at 72.  Although Plaintiffs were hired by Dima Fence, the record is clear that the work they were hired to perform for Dima Fence was ultimately on behalf of Libqual Fence.  Canales Tr. 22:12-15; Pls.' COMF ¶¶ 27-30. This factor therefore weighs in favor of finding formal control.  *See Greenawalt*, 642 Fed. App'x at 40 (finding that the "district court rightly found, this factor strongly favors a finding of joint employment, since plaintiffs worked almost entirely at [the putative joint employer's] stores)*; Vasto,* 2017 WL 4877424, at *15 (finding that the sixth Zheng factor weighed in favor of joint control where, during the relevant time period, plaintiffs worked only for the putative joint employer); *Jean-Louis*, 838 F. Supp. 2d at 136 ("The parties do not dispute that, during the time period at issue in this case, Metro technicians performed installations only for Time Warner. Accordingly, this factor weighs in favor of finding that Time Warner jointly employed Metro technicians.").

### vii.   Other Relevant Factors

A district "court is also free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng,* 355 F.3d at 72.  Plaintiffs argue that the fact that Canales never informed Libqual Fence's client that he was affiliated with Dima Fence when he performed work for Libqual Fence supports the inference that they are joint employers.  Pls.' Opp'n at 6, 10.  The court in *Jean-Louisi* rejected a similar argument, reasoning that "[w]hat a third party has seen or been told has almost nothing to do with whether [the putative joint employer] in fact had [the power to control the workers in question.]."  *Jean-Louis*, 838 F. Supp. 2d at 135-36.  Therefore, this factor does not support a finding of joint employment.

### 3.     *Final Assessment of Joint Employment Issue*

It is true that joint employment is a mixed question of law and fact and that "[m]ixed questions of law and fact are 'especially well-suited for jury determination.'" *Zheng v. Liberty Apparel Co., Inc.,* 617 F.3d 182, 185 (2d Cir. 2010) ("*Zheng II* ") (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir.1999)).  However, this is one case where the Court can "conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to plaintiffs, defendants are still entitled to judgment as a matter of law." *Zheng*, 355 F.3d at 76.  "To reach that conclusion, the Court need not decide that *every* factor weighs against joint employment." *Id.* at 76–77 (emphasis in original).  In sum, based on the analysis of the formal and functional control factors and the additional relevant factors Plaintiffs have identified, the Court concludes that the evidence in the record would not permit a rational factfinder to conclude that Defendants were joint employers under FLSA and the NYLL.  Viewing the evidence in the light most favorable to Plaintiffs, there are no *Carter* factors which weigh in favor of joint employment, and only one *Zheng* factor weighs in favor of joint employment.  The first and second *Zheng* factors are ultimately inconclusive (although the first factor potentially weighs in Defendants' favor).  The third, fourth, and fifth factors weigh against a finding of joint employment and the sixth factor alone weighs in favor of such a finding.  Of these factors, "*[m]ost importantly*, the fifth [functional control] factor is not satisfied; [Defendants] did not supervise plaintiffs' work, manage plaintiffs on a day-to-day basis, or evaluate plaintiffs' performance" beyond quality control assessments. *Vasto*, 2017 WL 4877424, at *15–16 (emphasis in original) (quoting *Godlewska*, 916 F. Supp. 2d at 265).  Balancing the *Zheng* factors, the weight of the evidence does not favor a finding of joint

employment.  *Id*. ("[A]fter analyzing the relevant functional control factors, the Court finds that, 'on balance,' Credico did not exercise functional control over Cromex field agents" where the "first, second, and fourth factors are inconclusive; the third and fifth disfavor a finding of functional control; and the sixth alone favors such a finding."); *see also Martin*, 273 F. Supp. 3d at 433–34 ("Considering the six factors together, only the sixth factor favors plaintiffs' claim of functional control, whereas four (the first, second, third, and fifth) favor Sprint's contrary claim. And even if the Court were to treat the fourth factor as favoring plaintiffs rather than being inconclusive, the balance of factors would still weigh strongly against finding Sprint's functional control."); *Godlewska*, 916 F. Supp. 2d at 265 (on balance no functional control even where "the overlapping second, sixth, and, to a lesser extent, fourth [functional control] factors are satisfied").  Because the Court finds that Defendants neither formally nor functionally controlled Dima Fence's employees, including Plaintiffs, Defendants cannot be held liable for the claimed FLSA and NYLL violations as joint employers.

Consequently, the Court respectfully recommends to Judge Brodie that Defendants' motion for summary judgment be GRANTED as to Plaintiffs' FLSA and NYLL claims.

### B.      Freelance Isn't Free Act

Plaintiffs' remaining claim against Defendants alleges a violation of FIFA, NYCAC § 20-929.  *See* SAC ¶¶ 136-142.  FIFA regulates the relationship between "freelance work[s]" and those who retain their services, the "hiring party," in New York City.  *See* NYCAC § 20-927.  As defined, a "freelance worker" means any natural person or any organization composed of no more than one natural person … that is hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation."  *Id*.  The term "hiring party" means any person who retains a freelance worker to provide any service.  *Id*.  As

an initial matter, the Court notes that none of the parties, including Plaintiffs, appear to contend that Plaintiffs were "freelance workers," *i.e.*, independent contractors, for which FIFA would apply. Even assuming they were, the hiring party under these circumstances would be Dima Fence, not Defendants, for similar reasons noted above. Accordingly, the Court respectfully recommends to Judge Brodie that Defendants' motion for summary judgment be GRANTED as to Plaintiffs' FIFA claim.

V.     CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Brodie that the corporate Defendant Libqual Fence and individual Defendants Strianese and Juarez's motion for summary judgment be GRANTED, dismissing Plaintiff's FLSA claim (Count I), NYLL claims (Counts II-VI), and NYCAC (FIFA) claim (Count VII).

VI.     OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See* Fed. R. Civ. P. 6(a), (e). Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF. **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Margo K. Brodie. Any requests for an extension of time for filing objections must be directed to Judge Brodie prior to the expiration of the fourteen (14) day period for filing objections**. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Central Islip, New York
      February 5, 2021


<u>/s/ A. Kathleen Tomlinson</u>
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge